John P. Costello, Esq. (California State Bar No. 161511)
Pamela W. Bertani, Esq. (California State Bar No. 182672)
**COSTELLO LAW CORPORATION**
331 J Street, Suite 200
Sacramento, California 95814
Telephone No.: (916) 441-2234; Fax No: (916) 441-4254

Glenn W. Peterson, Esq. (California State Bar No. 126173)
**MILLSTONE, PETERSON & WATTS, LLP**
2267 Lava Ridge Court, Suite 210
Roseville, CA 95661
Telephone: (916) 780-8222; Fax No: (916) 780-8775

*Attorneys for Plaintiff/Counterdefendant*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARMICHAEL LODGE NO. 2103, BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE UNITED STATES OF AMERICA, a California Corporation,<br><br>Plaintiff,<br>vs.<br><br>RONALD L. LEONARD dba RV TRAVEL GUIDES, a California Company, and DOES 1 through 50, inclusively,<br><br>Defendants.<br>_____<br>RONALD L. LEONARD, an individual,<br><br>Counterclaimant,<br>vs.<br><br>CARMICHAEL LODGE NO. 2103, BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE UNITED STATES OF AMERICA, a California Corporation,<br><br>Counterdefendants. | Case No. 2:07-CV-02665<br><br>**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT RONALD L. LEONARD'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION OF CLAIMS**<br><br>JUDGE: Lawrence K. Karlton<br><br>DATE: June 15, 2009<br>TIME: 10:00 a.m.<br>COURTROOM: Four |

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ......................................................................................................... ii

I. INTRODUCTION .............................................................................................................. 1

II. BRIEF ANSWERS ............................................................................................................. 1

III. FURTHER ARGUMENT .................................................................................................. 2

    A. The Elusive Idea-Expression Dichotomy And The Merger Doctrine ........................ 3

    B. The Expansion of Copyright Protection Against Non-Literal Copying ..................... 4

    C. The Elks' Guides Easily Meet the Creativity Standard For Such Works.................... 8

    D. A Travel Guide For Elks, Without Any RV Information, Would Still Be Copyrightable If The Selection or Arrangement Of Information Did Not Merge Idea And Expression ........................................................................................ 11

    E. An Elks RV Travel Guide Is Copyrightable Provided That, Again, Ideas Do Not Merge With Expression ........................................................................................ 12

IV. SUMMATION .................................................................................................................. 13



PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

# TABLE OF AUTHORITIES

**CASES**                                                   **PAGE NO.**

*Apple Computer, Inc. v. Franklin Computer Corp.*,
   714 F.2d 1240 (3d Cir. 1983), *cert. dismissed*, 464 U.S. 1033 (1984) ............................ 3

*Baker v. Selden*,
   101 U.S. 99 (1880) ........................................................................................... 3, 4, 5, 13

*Feist Publications, Inc., v. Rural Telephone Service Co., Inc.*,
   499 U.S. 340 (1991) ................................................................................... 8, 10, 11

*Harper & Row, Publishers, Inc.* v. *Nation Enterprises*,
   471 U.S. 539 (1985) ............................................................................................ 10

*Jewelers Mercantile Agency, Ltd. V. Jewelers Weekly Publishing Co.*,
   155 N.Y. 241 (1898) ............................................................................................ 11

*Kregos v. Associated Press,*
   937 F.2d 700 (2d Cir. 1991) ................................................................................ 10

*New York Times v. Roxbury Data Interface, Inc.*,
   434 F.Supp. 217 (D.N.J. 1977) ........................................................................... 12

*Nichols v. Universal Pictures Corporation*,
   45 F.2d 119 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931) ............................ 4

*Sheldon v. Metro-Goldwyn Pictures Corporation*,
   81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669 (1936) ................................. 5, 14

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation*,
   562 F.2d 1157 (9th Cir. 1977) ....................................................................... 5, 6, 14

**STATUTES**

Title 17, United States Code Annotated Section 101 ................................................ 7, 15

Title 17, United States Code Annotated Section 106 ..................................................... 7

Title 17, United States Code Annotated Section 106(2) ................................................. 7

United States Constitution, Article 1, Section 8 ............................................................. 8

**OTHER AUTHORITIES**

1 M. Nimmer, *Nimmer on Copyright*, Section 2.18[C] (1988) ....................................... 3

1 M. Nimmer, *Nimmer on Copyright*, Section 4.04 ..................................................... 11

The Idea-Expression Dichotomy in Copyright Law, 56 Tenn. L. Rev. 321 (1989) .......... passim

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

## I. INTRODUCTION

This supplemental brief is submitted pursuant to the Court's order dated June 22, 2009, (hereinafter the "Order"), and is additive to Plaintiff's prior brief filed on June 1, 2009 and entitled, "Plaintiff's Memorandum of Points and Authorities In Opposition To Defendant's Motion For Summary Judgment Or In the Alternative For Summary Adjudication of Claims." (hereafter the "Prior Brief"). This brief incorporates by reference the prior June 1, 2009 brief.

The Order required each party to file a supplemental brief addressing: (1) whether the publication of a travel guide for the Elks may be protected by copyright, and (2) whether the decision to publish an RV travel guide for the Elks may also be protected by copyright. These two questions were subdivided from a more general one articulated by the Court: "This issue is whether the publication of a travel guide directly addressing Elks members is eligible for copyright protection."

## II. BRIEF ANSWERS

The overarching issue is the most readily dispatched. A travel guide directly addressing Elks members is--on the undisputed facts of this case--entitled to copyright protection. The legislative reports underlying the 1976 Copyright Act define "to the public" as distribution to persons under no explicit or implicit restrictions regarding disclosure of the contents. There is no evidence before the Court that distribution of the subject guides was restricted in any way. A work is considered published as long as copies of the work are offered to "all comers and not only to a class." Such is the case here. We have also offered affirmative evidence that the Guides were sold to the public. See also concurrently-filed declaration of Forrest Wright, ¶7. Therefore, the publication of a travel guide for the Elks is protectable. Whether "the decision to publish" an RV travel guide for the Elks may also be protected is a more provocative question. The "decision to publish" seems tantamount to an idea, as opposed to the expression of an idea. This implicates the age old "idea-expression dichotomy," which has been said to be definitive of copyright protection—i.e., that it protects the fixed expression or manifestation of an idea rather than the fundamental idea itself. Therefore, we answer that query in the negative—whatever the subject matter, the "decision to publish" it does not qualify for copyright protection.

-1-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

Embedded, perhaps, in the Court's queries for further briefing is whether the related doctrines of "merger" and "scenes a faire" may intersect the copyright analysis on this motion. Merger does not, for reasons which we shall explain below. "Scenes a faire" (or "obligatory scenes") refers to scenes in a work which are obligatory for a genre of its type. Copyright protection has been withheld on certain elements of a creative work when they are mandated by or customary to the genre. Here, there is no evidence before the Court from which such a determination can be made. Stated simply, neither side has put forth any industry evidence, nor evidence to stake out a genre, much less what elements are considered obligatory within the genre. While the Court might, unaided by industry evidence, determine merger, the "scenes a faire" determination cannot be made without such evidence.

### III. FURTHER ARGUMENT

> There is hardly a single principle of copyright law that is more basic or more often repeated than the so-called idea-expression dichotomy. The doctrine is followed dutifully as an unquestioned principle in hundreds of cases: the "ideas" that are the fruit of an author's labors go into the public domain, while only the author's particular expression remains the author's to control. This principle, sometimes described as having constitutional origins, was developed by the common law, and has now been incorporated into the copyright act itself.

E. Samuels,[1] *The Idea-Expression Dichotomy in Copyright Law*, 56 Tenn. L. Rev. 321, 321-22 (1989). Professor Samuels further notes that some commentators who have studied the idea-expression dichotomy in the greatest detail have criticized it, arguing that continued recognition of the dichotomy is neither justified nor helpful in deciding cases. Yet, not only have the courts continued to embrace the idea-expression dichotomy, they have extended it to explain related copyright problems, which over the years had also led to confusion. Nevertheless, the cases generally do not analyze the principle in detail; and rarely (if ever) is the doctrine actually decisive of particular cases. Perhaps this should not be surprising, since the doctrine is so general in its statement as to defy particular application. It is not a doctrine that could be used predictably to put a particular work either into the public domain or within the author's exclusive rights; instead, it seems to be an ex post facto characterization that justifies an outcome based upon other, more concrete,

---

[1] Professor of Law, New York Law School. B.A., 1971, Yale University; J.D., 1974, Columbia University.

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

factors. Thus, if the outcome in a particular case is to be infringement, the work is deemed to be protectable expression; if the outcome is to be noninfringement, then the work is described as an "idea." *Id*. at 323.

**A.     The Elusive Idea-Expression Dichotomy And The Merger Doctrine**

The merger doctrine traces its roots back to the seminal case of *Baker v. Selden*, 101 U.S. 99 (1880).  The Supreme Court invoked a merger theory by focusing upon the utilitarian or practical nature of the original work. The Court concluded that "where the art it teaches cannot be used without employing the methods and diagrams used to illustrate the book, or such as are similar to them, such methods and diagrams are to be considered as necessary incidents to the art, and given therewith to the public." *Baker*, 101 U.S. at 103 (1880).   Professor Samuels argues that, if this theory is the primary justification for the *Baker* outcome, *Baker* might be limited to particular kinds of works—architectural works, fashion designs, charts and forms—which by their nature merge idea and expression. "Thus, the *Baker* holding need not be viewed as one that would apply to the broader category of works that are capable of more than one type of expression."  56 Tenn. L. Rev. at 329. The merger theory has also been criticized. Professor Nimmer, for example, has argued that "it is factually erroneous to conclude that there is any system or method which can be performed by the use of only one particular form of written expression."  1 M. Nimmer, *Nimmer on Copyright* , note 23, §2.18[C], at 2-202 (1988).  Professor Nimmer continued: "The mischief of the doctrine . . . is that by reason of the false assumption that the underlying 'art' will be monopolized unless the written expression may be copied, the courts permit copying of such expression when the copier could have obtained use of the 'art' without such copying if he had exercised ingenuity in creating his own original form of written expression. *Id*. §2.18[C], at 2-204.  While the *Baker* doctrine implies that utilitarian use alone should invalidate a copyright, subsequent courts have moved away from the "utilitarian" focus and zeroed in on whether there are other "expressions" that could be used to implement the ideas.  See, e.g., *Apple Computer, Inc. v. Franklin Computer Corp*., 714 F.2d 1240, 1253 (3d Cir. 1983), *cert. dismissed*, 464 U.S. 1033 (1984). In resolving the issue before them (i.e., the copyrightability of computer programs representing operating systems), the court in *Apple Computer* inquired whether there are other "expressions" that could be used to implement the ideas

-3-

of the Apple computer programs. *Id.*   This analytical evolution has been apparent enough that Professor Samuels concludes the *Baker* analysis is of "dubious vitality today."  56 Tenn. L. Rev. at 331.

**B.   The Expansion of Copyright Protection Against Non-Literal Copying**

Professor Samuels makes a strong case that the merger doctrine--although created to contract the scope of copyright protection—has actually expanded it.  He starts with a dissection of Judge Learned Hand's *abstraction* test in *Nichols v. Universal Pictures Corporation*, 45 F.2d 119 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931).   After a lengthy recitation of the plots of the two plays involved in the suit, Judge Hand stated:

> It is of course essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations. That has never been the law, but, as soon as literal appropriation ceases to be the test, the whole matter is necessarily at large, so that, as was recently well said by a distinguished judge, the decisions cannot help much in a new case.

*Id.* at 121.  Judge Hand stated that the taking of either plot or characters might be sufficient to constitute a copyright infringement.  He held, however, both as to incident and character, that "the defendant took no more—assuming that it took anything at all—than the law allowed."

Judge Learned Hand seemed to say that the concepts of substantial similarity and idea-expression should be applied in different types of infringement cases, and that the tests are distinguishable. Substantial similarity is appropriate for determining whether portions taken directly from the original work are infringing; but this test is inapplicable, however, when the plot outline or generalized character is taken.  In such cases, a different test—that of idea-expression—must be used to determine the extent to which the copyrighted work represents an idea or its expression. The difference between these two tests seems to be that the idea of a play or a character can be determined *by reference to how well delineated it is in the original*:  "the less developed . . ., the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." Although the facts of the *Nichols* case may not have required the development of a new test, the test that Judge Hand developed (known as the "abstractions" test) did pave the way for later cases which clarified the continued expansion of copyright law to protect against nonliteral copying.  The most

-4-

celebrated such case was *Sheldon v. Metro-Goldwyn Pictures Corporation*, 81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669 (1936), in which Judge Learned Hand, speaking for a unanimous court, found copyright infringement where there was no identifiable language that was actually copied. *Sheldon*, 81 F.2d at 55-56. Professor Samuels offers this critique of the "abstractions" test:

> Another prime example of how the abstractions test came to be used as a means of expanding rather than contracting the universe of works eligible for copyright is the case of *Mazer v. Stein*. [Citation] In *Mazer*, the United States Supreme Court recited a classic statement of the idea-expression dichotomy and characterized the *Baker* case as standing for that dichotomy. [Citation] Because the Court upheld Stein's claim of infringement, however, the Court necessarily viewed the infringing work as having taken the expression and not the mere idea. [Citation] The dichotomy was recited primarily to justify the expansion of copyright to include even utilitarian works: that was, the expansion was possible precisely because, as the idea-expression dichotomy reminds us, the resulting copyright is limited. *In this sense, an apparent limitation on the scope of copyright law has been used to accomplish an expansion of the subject matter of copyright.*

56 Tenn. L. Rev. at 346 (emphasis ours).

The Ninth Circuit, in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation*, 562 F.2d 1157 (9th Cir. 1977), concluded that "the distinction accurately conceptualizes the fundamental elements in an artistic creation and balances the competing interests inherent in the copyright law." *Id*. at 1163 n.6. The court cited several commentators who described the idea-expression dichotomy as "outmoded because it was developed under older, narrower statutes which have since been considerably broadened." *Id*. The court nonetheless embraced the dichotomy as good law:

> We have surveyed the literature and have found that no better formulation has been devised. Moreover, most of these criticisms are directed at the fact that the courts tend to pay only lipservice to the idea-expression distinction without it being fairly descriptive of the results of modern cases. This is a criticism more of the application of the distinction than of the distinction itself, and can be alleviated by the courts being more deliberate in their consideration of this issue.

*Id.* Thus, the necessity of the doctrine rests upon the danger that copyright law would otherwise be extended too far. As the court further stated:

> Application of [the substantial similarity test] would produce some untenable results. For example, a copyright could be obtained over a cheaply manufactured plaster statue of a nude. Since ownership of a copyright is established, subsequent manufacturers of statues of nudes would face the grave risk of being found to be infringers if their statues were substantially similar and access were shown. The

-5-

>    burden of proof on the plaintiff would be minimal, since most statues of nudes would in all probability be substantially similar to the cheaply manufactured plaster one.

*Id*. at 1162-63.

The Ninth Circuit seemed willing to concede that the limited scope of protection, covering only original elements of expression, theoretically militates against an over-extensive application of the copyright laws. Yet, the court perceived that a substantial practical burden is placed upon manufacturers of products: in a copyright suit with a clear prima facie case, the burden would be upon the defendant to prove that the work was his own or to prove a lack of originality in the plaintiff's work. The court was unwilling to impose this burden upon the marketplace. 562 F.2d at 1165. The court concluded that a "limiting principle is needed," and that "the classic distinction between an 'idea' and the 'expression' of that idea" provides the needed limitation. 562 F.2d at 1163. Of the *Krofft* case, Professor Samuels wrote as follows:

>    Indeed, *Krofft* represents about the farthest judicial extreme in finding that the nonliteral taking of expression, which arguably borders upon the taking of an idea only, can constitute an infringement of copyright. The court in *Krofft*, following *Arnstein v. Porter*, [citation] found that an intrinsic (or relatively subjective) test of infringement is the relevant test. [Citation] Therefore, even if the works are not substantially similar (which the court did not concede), the test is one of "total concept and feel," which, in the given case, appropriately was found by the jury to be substantially similar. [Citation] *Krofft*, <u>if it is seen as an idea-expression case, makes clear that protection may be granted even for works which tend toward the idea side of the idea-expression continuum</u>. (Emphasis ours).

Professor Samuels further notes that earlier critiques of the idea-expression dichotomy have focused upon the *lack of an adequate definition of what constitutes an idea*, and have suggested that different judges have in mind different concepts in applying the doctrine; or have argued that the doctrine simply does not reflect the marketplace that in fact pays handsomely for ideas. 56 Tenn. L. Rev. at 370-71. He further posits that "the problem with the idea-expression dichotomy goes beyond the typical difficulties in defining the terms." *Id*. at 371. To explain this criticism, it is first necessary to review some basics of copyright. It is quite clear that copyright protects against exact copying, as well as against other particular uses of works listed in the exclusive rights of copyright. "The idea-expression dichotomy was developed to apply to, and indeed only makes sense when applied to, persons who infringe by making nonliteral copies of copyrighted works." *Id.*

-6-

Copyright law provides five exclusive rights in a copyrighted work: the rights (1) to reproduce the work, (2) to make derivative works of it, (3) to distribute it, (4) to perform it publicly, or (5) to display it publicly. 17 U.S.C.A. §106.   Although the term "reproduce" is not defined in the act, the term "copies" is.  Copies are "material objects . . . from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C.A. §101 (defining "copies").  Thus, what we might call "exact copying" of copyrighted works is clearly prohibited by the act, unless the case is covered by an exemption or limitation in the other sections of the act.  Additionally, it is an infringement of copyright for another person to make a nonliteral copy of a protected work, such as by incorporating it into a new and independent work using a portion that is "substantially similar" to the copyrighted work.  Such infringing activity would seem most logically to fall under the right to make derivative works, since it results in the creation of a new work, potentially copyrightable in its own right, that is "based upon one or more preexisting works." See 17 U.S.C.A. §101 (defining "derivative work"); 17 U.S.C.A. §106(2).

As copyright expanded to cover nonliteral infringement, major principles of copyright law were required to determine which nonliteral copies should constitute infringements and which should not.  For example, the doctrine of substantial similarity, which is used to determine if a person has "copied" a work, really has application only in the case of a nonliteral copy: if someone copies a work exactly, then we need not look to the substantiality of the copying, since it is identical. Professor Samuels sums up the difficulties inherent in applying the idea-expression dichotomy:

> In short, many of the traditional tests of copyright infringement—substantial similarity, access, idea-expression dichotomy, and fair use—seem to have been developed precisely to handle the case of the nonliteral copier. The case against the person making an exact copy on most of these principles is almost a *per se* case, as compared to that of the person making the nonliteral copy, for whom a rule of reason—and a case by case determination of liability—may be more appropriate. (Citations omitted).

56 Tenn. L. Rev. at 372.

So, whereas the focus of the idea-expression dichotomy is upon whether the work constitutes idea or expression, the merger doctrine focuses upon whether the work is *capable* of alternative expressions.  Thus, Professor Samuels argues, the doctrine seems to impose upon the copyright claimant the task of demonstrating that the idea of the work is capable of other noninfringing

expressions, which will then presumably be compared to the defendant's work in determining whether the particular taking will be allowed. 56 Tenn. L. Rev. at 383. Here, that showing is easily made. See David Declr., ¶¶ 10-13.

### C.    The Elks' Guides Easily Meet the Creativity Standard For Such Works

*Feist Publications, Inc., v. Rural Telephone Service Co.*, 499 U.S. 340 (1991), was a United States Supreme Court case in which Feist had copied information from Rural's telephone listings to include in its own, after Rural had refused to license the information. Rural had sued for copyright infringement. The ruling of the Court was written by Justice O'Connor. It examined the purpose of copyright and explained the standard of copyrightability as based on originality.

It is a long-standing principle of United States copyright law that "information" is not copyrightable, O'Connor notes, but "collections" of information can be. Rural claimed a collection copyright in its directory. The court clarified that the intent of copyright law was not, as claimed by Rural and some lower courts, to reward the efforts of persons collecting information, but rather "to promote the Progress of Science and useful Arts" (U.S. Const., Article 1, Section 8), that is, to encourage creative expression.

Since facts are purely copied from the world around us, O'Connor concludes, "the sine qua non of copyright is originality".  However, the standard for creativity is extremely low. It need not be novel, rather it only needs to possess a "spark" or "minimal degree" of creativity to be protected by copyright.

In regard to collections of facts, O'Connor states that copyright can only apply to the creative aspects of collection: the creative choice of what data to include or exclude, the order and style in which the information is presented, etc., but not on the information itself.  The ruling has major implications for any work that serves as a collection of facts or knowledge, as is the case here. Information from any source is fair game, but cannot contain any of the "expressive" content added by the source author. That includes not only the author's own comments, but also his choice of which facts to cover, his choice of which links to make among the bits of information, his order of presentation (unless it is something obvious like an alphabetical list), any evaluations he may have

///

-8-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

made about the quality of various pieces of information, or anything else that might be considered "original creative work" of the author rather than mere facts.

With the foregoing in mind, we return the Court's attention to matters previously briefed, and re-cast our contentions as follows: (1) There is no "merger" because there are innumerable noninfringing expressions available to Defendant Leonard;[2] (2) The threshold for copyrightability for a compilation is extremely low and selection or arrangement that uses some modicum of the author's judgment is enough to render it copyrightable; (3) There is no "merger" where a type of work of authorship is not limited by industry convention as to types of information in a compilation; and (4) There is no merger if the choices of information selected or arranged are not garden variety or obvious.

In our Prior Brief, we provided the Court with evidence consisting of online RV travel guides from RV Woodall's, Inc. and Good Sam Club, Inc., who represent prominent RV guides in the RV guide industry (hereinafter "Industry Guides"). In comparing the guides authored by Barbara and Ira David (hereinafter "ELKDOM Travel Guides") with the Industry Guides, Plaintiff demonstrated that the categories of information in the ELKDOM Travel Guides were different than those categories chosen in the Industry Guides. In doing so, Plaintiff demonstrated that there are a wide range of options as to categories of information available to RV guide authors and that there were no industry limitations that applied. (Plaintiff's Prior Brief, Pages 16-18.)

However, now the Court's interest appears to lie in the available range of options of information which can be selected for putting into an "Elks-related" travel guide rather than a general Industry Guide. This implicates a microcosmic industry of "Elks RV Travel guides" only, rather than RV Travel Guides in general. This betrays an interest in seeing whether the Defendant was limited to the same choices of information categories as those in the ELKDOM Travel Guides.

---

[2] See our Prior Brief, pp. 16-18. For instance, Defendant could have chosen information pertinent to RV travel not contained in the ELKDOM Travel Guides, such as: a cursory menu if an eating facility exists (e.g. "Wednesday is steak night"); proximity to an RV parts business; cable TV hook-up availability, etc. – and any number of other such informational categories. In short, this demonstrates, how, with a little creativity, Defendant could have created his own unique Elks RV guides by selecting many categories of other information useful to Elks RVers. Instead, he chose to pirate the Elkdom Travel Guides verbatim, with regard to the selection of information placed in the information categories by the Davids, the original authors of the Guides.

-9-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

If the Plaintiff and Defendant were both limited to the same choices of information, then presumably "merger" between ideas and expression would occur, thereby destroying the possibility of copyright for either the ELKDOM Travel Guides or the Ron Leonard Guides (hereinafter "Elks RV Guides"). Leonard has not argued that he was under any such limitation, nor has any evidence been adduced in this motion that such constraints existed.

To further demonstrate that doctrines of merger and/or scenes-a-faire do not apply here, Plaintiff has concurrently filed the declaration of Ira David, the original co-author of the ELKDOM Travel Guides, which speaks to the range of options of information that was available to select from for creating an Elks RV Guide. See David Declr., ¶¶ 10-13. The Davids only selected a fraction of the available information that they could have included in their ELKDOM Travel Guides. Therefore, the Defendant was not limited to selecting the same information in his guides; instead he chose to copy the same information selected and arranged by the Davids.

Choices as to selection and arrangement of facts are copyrightable as a compilation so long as they are made independently by the compiler and entail a minimum degree of creativity. *Feist Publications, Inc. v. Rural Telephone Co.*, 499 U.S. 340, 361 (1991). The requisite level of creativity is *extremely low*; even a slight amount will suffice; the vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. *Feist*, at 345. Thus, even a directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement. *Id*. at 372, citing *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U.S. 539, 547 (1985). The requisite originality may reside in the *selection or arrangement alone*, even if the other ingredient is lacking. *Kregos v. Associated Press,* 937 F.2d 700 (2d Cir. 1991).

In the ELKDOM Travel Guides, the authors selected information categories, drew maps of areas surrounding Elks Lodges and drafted notes relating to different lodges. They then arranged this information alphabetically, by city in which a lodge was located and then further arranged this information in a series of ELKDOM Travel Guides I-III arranged by regional selection of states in the United States. (*See* Prior Brief, especially pages 14-23). The Prior Brief already addressed the

-10-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

fact that under *Feist* the ELKDOM Travel Guides I-III meet and exceed the minimal level of copyrightability for a compilation.

### D. A Travel Guide For Elks, Without Any RV Information, Would Still Be Copyrightable If The Selection or Arrangement Of Information Did Not Merge Idea And Expression

The Court's Order first inquired: "Whether the publication of a travel guide for the Elks may be protected by copyright?" This question appears to have two parts, namely: 1) whether the Elks distributed copies of its ELKDOM Travel Guides in a manner that constituted publication; and 2) whether a travel guide for Elks, (without RV information?) is still copyrightable.

As to the first question, the answer is yes, the Elks method of distribution constituted publication. Publication occurs when by consent of the copyright owner the original or tangible copies of a work are sold, leased, loaned, given away or otherwise made available to the general public. *See Nimmer* 1:[§4.04]. A work is considered to be published as long as copies of the work are distributed to the public as a whole and are offered to "all comers and not only to a class." *Jewelers Mercantile Agency, Ltd. V. Jewelers Weekly Publishing Co.*, 155 N.Y. 241, 49 N.E. 872 (1898). In the present case, the ELKDOM Travel Guides I-III were indeed published as they were offered to the public at large and not just to the Elks membership. See Decl. of Forrest Wright at ¶ 7. The Guides were offered to not only the Elks membership, but were offered to anyone who wanted to purchase them. In the Wright Declaration, it is made clear that the Guides were offered and sold to individuals outside of the Elks membership. *Id.* Therefore, the Elks manner of distribution of the ELKDOM Travel Guides I-III constituted publication.

As to the second question, the answer is yes, as long as the selection and arrangement of information does not merge idea and expression. A general Elks Travel Guide lacking RV information would, under *Feist*, reduce information from which an author could select to create an Elks-oriented travel guide. If the ELKDOM Travel Guides were reduced to travel guides only, lacking RV information, they would be more akin to being directories. The selection of facts in a directory, regardless of their arrangement, has been found to warrant copyright protection as long as the selection involves some "significant subjective judgment." *New York Times v. Roxbury Data*

/ / /

1  *Interface, Inc.* 434 F.Supp. 217 (D.N.J. 1977). In *Roxbury*, the court determined that such judgment
2  was involved in selecting which names to put in a social directory, but not in a telephone directory.

3  Therefore, it seems that even without RV information, the ELKDOM Travel Guides are still
4  copyrightable. They would still have their map drawings, lodge addresses, and notes (albeit without
5  RV information). These same guides would still retain their alphabetical city arrangement and their
6  further arrangement and selection of certain states as laid out in Guides I-III. The Davids used
7  subjective judgment in drawing their maps of areas surrounding each lodge, they used judgment in
8  arranging the lodges alphabetically, by city, rather than by lodge number, for example. They used
9  judgment in dividing the Guides up into three regions of the country. They used judgment in
10 selecting certain states for each of the three regions. Finally, they drafted notes on each lodge which
11 include reams of selected information included in their notes.

12 Would such an Elks Travel Guide avoid merger between ideas and expression such that the
13 Carmichael Elks and the Defendant could copyright separate guides? The answer is still yes because
14 the Defendant *could have selected different information* to place in his notes, rather than copy the
15 Plaintiff's notes. The Defendant could have selected different states to include in his guides. The
16 Defendant might have decided to have two guides, one for states west of the Mississippi and one for
17 those east thereof. The Defendant might have drawn different maps. Also, the David Declaration
18 states other categories of travel-related information that the Defendant could have included in his
19 guide that would not have conflicted or merged with the Plaintiff's guides. *See* David
20 Decl. ¶¶ 10-13.

21 Therefore, the ELKDOM Travel Guides without RV information does not result in a merger
22 of ideas and expression. There were still many types of information that the Defendant could have
23 selected and re-arranged so as to not conflict with the ELKDOM Travel Guides I-III and create a
24 separately copyrightable guide.

25  **E.    An Elks RV Travel Guide Is Copyrightable Provided That, Again, Ideas Do Not Merge With Expression**
26

27 An Elks Travel Guide drawn to an audience of RVer's would be copyrightable because the
28 selection of information types to put into such a guide and the methods of arranging the information

-12-

1 is open to the subjective judgment of the authors. Also, the categories of information to put into
2 such guides are too numerous to create any danger of a merger or scenes-a-faire scenario. The best
3 treatment of how the ELKDOM Travel Guides I-III (which are "Elks RV Guides" in the purest
4 sense) were copyrightable compilations is found on Pages 16-19 of the Prior Brief. Also, in these
5 same pages of the Prior Brief it is discussed how the Defendant could have selected different RV
6 information or arranged it differently to come up with an entirely copyrightable compilation of his
7 own (*See* Prior Brief at pages 16-17). As further support of the arguments on this point in the Prior
8 Brief, the David Declaration expounds on the categories of information that they considered but did
9 not put into the ELKDOM Travel Guides I-III. This evidence of the unique selection and
10 arrangement of the Davids, coupled with the fact that the Defendant is not foreclosed from myriad
11 other non-infringing options as to selection and arrangement completely vitiates merger.

## IV. SUMMATION

13     Copyright law is, in many respects, counterintuitive-- whether intuition is fuelled by common
14 sense or a Harvard law degree. Its evolution has bred out many common sense precepts, resulting in
15 an inbred genotype that has consciously de-selected traits associated with equitable thought. That is
16 why some of the most brilliant legal minds of the past five generations have contorted the rule of law
17 that was intended to objectively define (some say limit) where copyright protection begins and ends.
18 That is why, as noted above, the keystone of copyrightability is less objective now than it was in
19 1880 when *Baker* was decided. It is that way because that has been the will of the common law.
20 The will of the judiciary embraces subjectivity because the leeway it provides is revered as part of
21 determining just and fair results. Thus, subjectivity in determining what is protectable represents the
22 sole breeding ground the law has left for the procreation of common sense and gut level justice in
23 infringement cases.

24     The statutory scheme envisions nearly mechanical applications to determine the metes and
25 bounds of a copyright claim. The judiciary has recognized the folly in that and has rejected the very
26 notion that a purely mechanical analysis can separate an idea from its expression. Indeed, not one of
27 the brilliant commentators cited above has ventured to define what constitutes an idea. Without
28 clarity-- or at least uniformity—on that, how can the distinction between idea and expression be truly

-13-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS

objectified? An idea is no more capable of being universally defined that is music or obscenity. It can be no surprise, then, that the judiciary has developed a Stewartesque "know-it-when-I-see-it" approach. That sums up how a trial court distinguishes idea from expression. The court knows it when it sees it.

That is how the idea of costumed characters from "H.R. Puffnstuf" was protected against misappropriation by McDonald's Corporation in *Krofft*. That is how Judge Hand found infringement in *Sheldon* even though no identifiable language was copied. Equity still speaks in copyright law, albeit softly. Below, we recap why equitable considerations are germane in this case.

Ron Leonard misappropriated--from a charitable cause—not just an idea; he misappropriated *the tangible expression of that idea* and he did so as a predator not as a competitor.[3] He perpetrated well plotted fraud on the Elks, first by misrepresenting that he was working on their behalf, then by publishing under the Elks' copyright notice, then by secretly changing the copyright notice on <u>one</u> of the inside pages. Then later, he defrauds the Copyright Office and explicitly lies to the examiner about the nature of his work.[4] Then later, he admittedly deceives consumers into buying his guides, knowing they would be mislead to assume that his guides were associated with the Lodge and the usual charitable causes, when they were not. Then he lies under oath to his brethren Elks in a failed effort to retain his membership. Then, caught in all these lies, he again lies to this Court in a sworn declaration where he claims he made the same typographical mistake in three of his copyright applications—mistakenly claiming the year of publication in a transparent attempt to resuscitate the "presumption of validity" underlying his registrations. This orgiastic display of corruption cannot be ignored. It is instructive as a bar to Leonard's infringement claim, for sure. But it is also instructive to this Court's articulation of the copyrightable subject matter at the heart of this case. And, while it is not possible to define "idea" over "expression" that suits all reasonable minds and makes sense in every case, it is easy to see in this case the mandates of equity, those being: Ron Leonard has made a nonliteral copy of the Elks protected work by incorporating it into a new and independent work,

---

[3] Leonard admitted in his deposition that he copied information from the Elks' guides, and we have submitted other evidence of direct copying. See Plaintiff's SSUF, ¶¶ 1-9.
[4] See Plaintiff's Rebuttal to Defendant's SSUF ¶ 31

-14-

potentially copyrightable in its own right, but "based upon one or more pre-existing works." 17 U.S.C.A. § 101 (defining derivative work). We remind the Court, further, that Leonard has made no attempt to challenge the "presumption of validity" underlying the Elks' registration of Guides I, II, and III. That presumption, therefore, remains intact and cannot be disrupted without adverse evidence, which has not been proffered here.

DATED: July 7, 2009

**MILLSTONE PETERSON & WATTS, LLP**
*Attorneys at Law*

By: /s/ GLENN W. PETERSON
GLENN W. PETERSON

Attorneys for Plaintiff Carmichael Lodge No. 2103, Benevolent And Protective Order Of Elks Of The United States Of America

DATED: July 7, 2009

**COSTELLO LAW CORPORATION**

By: /s/ JOHN P. COSTELLO
JOHN P. COSTELLO

Attorneys for Plaintiff Carmichael Lodge No. 2103, Benevolent And Protective Order Of Elks Of The United States Of America

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

**MILLSTONE PETERSON & WATTS, LLP**
*Attorneys at Law*

/s/ Glenn W. Peterson

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

**COSTELLO LAW CORPORATION**
/s/ John P. Costello
-15-

PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF CLAIMS