1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

CARMICHAEL LODGE NO. 2103,
10  BENEVOLENT AND PROTECTIVE
ORDER OF ELKS OF THE UNITED
11  STATES OF AMERICA, a
California corporation,

12
                                NO. CIV. S-07-2665 LKK/GGH
13          Plaintiff,

14      v.
                                      O R D E R
15  RONALD L. LEONARD dba RV TRAVEL
GUIDES, a California company,
16  and DOES 1 through 50,
inclusive,

17

18          Defendants.

19  _____/

20      The core of this action is a copyright dispute between

21  plaintiff/counterdefendant Carmichael Lodge No. 2103, Benevolent

22  and Protective Order of Elks of the United States of America

23  ("Carmichael Elks" or "Lodge") and defendant/counter-claimant

24  Ronald Leonard, d/b/a RV Travel Guides. Carmichael Elks filed suit

25  alleging that Leonard has infringed on the Lodge's copyrights

26  regarding various travel guides.  Leonard has brought various

                                1

counterclaims, including a claim that the Carmichael Elks is infringing on copyrights owned by Leonard for portions of the same guides. Pending before the court is Leonard's motion for summary adjudication as to these two cross copyright infringement claims. Carmichael Elks have not filed a cross motion as to either claim.

## I. BACKGROUND[1]

Carmichael Elks is a California corporation and the local chapter of a national fraternal organization, the Benevolent and Protective Order of Elks of the United States of America. Defendant and counterclaimant Ron Leonard is an individual presently residing in Carmichael, California. Leonard was a member of the Carmichael Elks from 1998 until July 11, 2008. Although Leonard's departure from the Carmichael Elks appears to be based on the circumstances underlying the instant copyright infringement claims, the facts of his departure do not influence the present motion.

### A.    The Elkdom Travel Guides

The parties' dispute concerns a series of travel guides. In or about 1984, two members of the Carmichael Elks, Ira and Barbara David, began creating a series of "Elkdom Travel Guides." These guides contain information about Elks lodges, accompanied by some

---

[1] Leonard has lodged objections to several items of evidence relied on by Carmichael Elks. Some of this evidence is not necessary to the resolution of the instant motion--including the portions of the deposition transcript challenged by Leonard's seventh objection. As to objections one through six, to the extent that the evidence objected to is relevant and the court has relied on it, those objections are OVERRULED.

1  maps, directions, and notes regarding points of interest. While the

2  guides include RV travel information, they include all Elks lodges

3  regardless of whether RV facilities are available.  Carmichel Elks

4  claims a protected interest in Elkdom Travel Guides I through III.

5       In 1988, Carmichel Elks obtained copyright registrations for

6  Elkdom Travel Guides I and II, Registration Nos. TX-2-522-753 and

7  TX-2-522-754. "Elkdom Travel Guide I" was originally published in

8  1984, and contains information regarding seven Pacific Coast

9  states. "Elkdom Travel Guide II" was initially published in 1986,

10  and pertains to eleven states east of those encompassed by Guide

11  I and west of the Mississippi River.[2]  The 1988 copyright

12  registrations indicate that Ira and Barbara David authored these

13  guides, but that the Davids assigned ownership of the copyrights

14  to the Carmichael Elks.

15       Elkdom Travel Guide III, pertaining to nine southeastern

16  states, was not included with these initial copyright

17  registrations.  Instead, Guide III was first published in or about

18  1991.  Carmichel Elks did not seek to register a copyright for

19  this guide until 2007, after the facts underlying this dispute had

20  already arisen.

21       Guides I through III follow the same format.  Prior to

22  Leonard's involvement in the guides, the guides were oriented in

23  a landscape or horizontal format, with the Elks logo and the badge

24

25       [2] This guide encompasses Montana, North Dakota, South Dakota,
    Wyoming, Nebraska, Utah, Colorado, Kansas, Oklahoma, New Mexico and
26  Texas.  The parties curiously label this grouping of states as
    "Midwestern."

3

for the Carmichael Elks on the cover.  The guides were divided into a section for each state, arranged alphabetically.  Each section provided information for cities that had an Elks lodge, alphabetized by city name.  The pages were divided in half vertically and horizontally, generating four "tiles," with information for each city presented in a single tile.  This information included the Elk's lodge number, phone number, address, meeting times, dinner hours, and bar hours.  Each tile also explained whether the lodge featured RV parking, applicable parking fees if any, the availability of water, electric, and dumping hookups, and whether the lodge had an RV club.  Finally, each tile included a section which could contain directions, miscellaneous information, or a small map.  Miscellaneous information included notations regarding lodge events such as bingo nights, regular menus (e.g., "Fish & Chicken Fri night"), and whether the lodge, instead of being a dedicated building, was another facility used for meetings (e.g., "Lodge meets at Vally Nat'l Bank Building on Coronado Blvd.").  Maps, if included, were simplified, including only major highways and streets, represented by straight lines of uniform thickness, and noting the location of the lodge.

From 1984 through 1992, these three guides were authored and updated by Barbara and Ira David.  During this time, other Carmichael Elks lodge members, primarily Muriel and Forrest Wright, were responsible for the printing and distribution.  In 1992, the Davids ceased participating in the production or updating of the guides.

**B.    Leonard's Initial Involvement with Guides I through III**

In or about 1998, Leonard, then a member of the Carmichael Elks, began working on the guides.  Leonard updated the guides by contacting the listed lodges to validate the information contained in the guides.  Relatedly, Leonard added to the notes for various lodges, incorporating information that was conveyed to him by Forrest Wright (who in turn received information from travelers) and that Leonard received over the internet.  Deposition of Forrest Wright 38:5-15.  Leonard put this information into his own words. Declaration of Ronald Leonard Supp. Def.'s Mot. Summ. J., ¶ 3. Leonard also performed word processing and desktop publishing tasks.  After Leonard began working on the guides, the guides switched from a landscape to a portrait layout, and switched from using four tiles on each page to four rows.  Lastly, he replaced the maps, using curved lines to represent roads, thicker lines to represent freeways, signifying highways and freeways by presenting the road number in a symbol overlaying the line rather than with text, and by using a star symbol rather than a box to indicate the location of the lodge.  These changes were first reflected in guides printed in 2000.  In performing the above, Leonard used information contained in prior versions of the Elkdom Travel Guides, but exclusively relied upon online mapping tools for creating the maps.

During this time, Forrest Wright continued to manage the printing and distribution of the guides.  Mr. Wright also conveyed information from lodges and Elks travelers to Leonard to be

1   included in the guide.  On at least one issue, Mr. Wright exercised

2   control over the content of the guides.  Leonard suggested

3   abbreviating the information regarding lodges that did not provide

4   parking for RVs, a change that would make the guides more RV-

5   centric, but Wright rejected this suggestion.[3]  Wright Dep., 41:9 -

6   43:7.  Other than the various Elks members who submitted the

7   information that was included in the guides, no other individuals

8   were directly involved in the production of the content for Guides

9   I through III.

10      Leonard did not receive monetary compensation aside from

11   reimbursement of printing expenses.  Leonard never executed any

12   written agreement regarding ownership of his contributions to the

13   guides.  Leonard updated the guides in this manner until April of

14   2007.

15   **C.  Elkdom Travel Guide IV**

16      Separate from the above three guides, in or about June 1996,

17   Carmichael Elks granted Gulf Coast Lodge No. 2782, located in Gulf

18   Shores, Alabama, the right to publish Elkdom Travel Guides covering

19   specified Northeastern States.  Compl. ¶¶ 15-16.  The Gulf Coast

20   Lodge published Elkdom Travel Guide IV, covering these states,

21   until October 13, 2005. At that time, the Gulf Coast Lodge entered

22   an agreement with Carmichael Elks wherein the Gulf Coast Lodge

23   returned the right to publish Elkdom Travel Guide IV to Carmichael

24   Elks in exchange for an agreement to pay royalties to the Gulf

25

26      [3] As noted below, Leonard would later implement this change in the guides he published separately.

1   Coast Lodge.  Despite this development, Carmichael Elks has not

2   published the fourth guide.  In May of 2006, Leonard entered into

3   a separate arrangement with the Alabama lodge to publish Elkdom

4   Travel Guide IV without the involvement of Carmichael Elks.

5   **D.   Leonard's Claim to Copyright in the Guides**

6        The Elkdom Travel Guides published from 2000 to 2006 bore a

7   notice stating that the copyright for the guides was owned by

8   Carmichael Elks.  At some point in 2006, Leonard replaced this

9   notice with one stating that the copyright was owned by RV Travel

10  Guides, e.g., "Copyright © 2000, 2001, 2002, 2003, 2004, 2005,

11  2006; RV Travel Guides, Sacramento, CA."  R. Leonard Decl. Ex. A

12  (May 12, 2006, deposit copy of Elkdom Travel Guide I).  This change

13  did not occur uniformly.  For example, the "deposit copy" of Elkdom

14  Travel Guide I submitted in connection with Leonard's copyright

15  registration includes the above internal statement, and the cover

16  of this guide also indicates that the copyright is owned by RV

17  Travel Guides.  R. Leonard Decl. Ex. A.  However, in the November

18  28, 2006 printing of Elkdom Travel Guide I, the cover states "©

19  BPOE Lodge 2103, Carmichael, CA" while the first page includes the

20  RV Travel Guides copyright statement.  See Deposition of Ronald

21  Leonard, 97:8-98:4.

22       On January 9, 2007, Leonard applied to register copyrights for

23  the May 12, April 16, March 6, and October 1 2006 editions Elkdom

24  Travel Guides I through IV, respectively.  Registration Nos. TX

25  6-585-010, TX 6-585-011, TX 6-585-012, TX 6-585-013 Compl. Ex. D-G.

26  Leonard used a "short form" application provided by the Copyright

1  Office.  This form required that he specify the "year of creation"

2  for the subject work.   On each form, Leonard answered "2000,"

3  although Leonard now declares that this was in error, such that the

4  works were created in the years he provided as their initial

5  publication.  Leonard indicated that he was the sole author of each

6  work and owner of each copyright.  The short form did not inquire

7  as to whether there were any prior registrations of the subject

8  works.

9       Both parties have introduced copies of Leonard's registration

10  forms, all of which bear a "certificate of registration" from the

11  Copyright Office indicating that the registrations became effective

12  on January 9, 2007.  Carmichael Elks state that these registrations

13  were nonetheless not granted by the Copyright Office until some

14  time after March 2, 2007, but Carmichael Elks have not introduced

15  any evidence to this effect.[4]

16  _____

17       [4] Carmichael Elks state in their opposition memo that on March
    2, 2007, Alden Almquist, a copyright examiner, sent a letter
18  explaining the following:

19            We are delaying registration because this work
             contains preexisting material, and the Short
20           Form application your [sic] used does not have
             space to distinguish old and new material.
21           When a new work contains material that has
             been either previously registered or
22           published, or that is in the public domain,
             the copyright claim must be limited to the new
23           copyrightable authorship that has been added.
             In such cases, the application should describe
24           both preexisting material and the added
             material in the space provided for this
25           information.  This information is required
             regardless of whether you or someone else
26           published the preexisting material, or whether
             the preexisting material is copyrighted or in

1     On January 19, 2007, Leonard wrote a letter to Carmichael Elks

2  stating that

3           effective 3-31-2007, I am withdrawing
           permission to use my copyrighted format and
4           maps used in Elkdom Travel Guides I, II and
           III, which I created and have registered with
5           the US Library of Congress Copyright Office.
           My copyright extends only to the format
6           (layout) of the Guides, and to the maps which
           I created, so perhaps another editor/publisher
7           can be found who will prepare and use a
           different format.

8

9  R. Leonard Decl. Ex. E.

10  **E.    Carmichael Elks' 2007 Registration of Elkdom Travel Guide III**

11     On March 27, 2007, Carmichael Elks filed to register a

12  copyright for the then-current edition of Elkdom Travel Guide III.

13  The certificate of registration lists Ira and Barbara David as the

14  authors of this guide, and does not mention Leonard.  Nor does the

15  certificate mention the registrations filed by Leonard on January

16  of 2007, or otherwise refer to the dispute regarding these

17  materials.

18  **E.    Subsequent Sale of the Guides**

19     On or about April 2007, Leonard began to sell the guides

20  independently, under the title "Elk RV Travel Guides."   In

21

           the public domain.
22

23  This purported quote appears in Carmichael Elks' opposition
    memorandum and complaint, but not in any evidence submitted by
    Carmichael Elks.
24     While the Carmichael Elks contend that Leonard's registrations
    became effective at a later date, they have not provided any
25  explanation as to why the application forms indicate that the
    registration became effective on January 9, 2007, or on what later
26  date the registrations took effect.

1   preparing these guides, Leonard also added latitude, longitude and

2   elevation information for each lodge, removed the Elks logo from

3   the cover, revised and added some notes, and revised the format of

4   the guides to list lodges that do not offer RV parking at the end

5   of each section in an abbreviated form.  R. Leonard Decl. Ex. F-H.

6       Since March 2007 Carmichael Elks have continued to sell

7   versions of Guides I, II, and III that are based on the last

8   versions Leonard contributed to before the dispute arose.  Wright

9   Dep. 74:10-17.  The versions sold by Carmichael Elks are nearly

10  identical to the versions for which Leonard obtained copyright

11  registrations, with only minor revisions consisting of updates to

12  some of the lodge information.  See Exhibits H-M to the Declaration

13  of Mark Leonard Supp. Def.'s Mot. Summ. J.  As of April 27, 2009

14  the Carmichael Elks were still referring customers for Leonard

15  Guide IV to Leonard. M. Leonard Decl. Ex. A (Wright Depo. 98:15-23)

16                **II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

17      Summary judgment is appropriate when it is demonstrated that

18  there exists no genuine issue as to any material fact, and that the

19  moving party is entitled to judgment as a matter of law.  Fed. R.

20  Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157

21  (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467

22  (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr

23  v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th

24  Cir. 1984).

25      Under summary judgment practice, the moving party

26  ////

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

_Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" _Id_. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. _Id_. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." _Id_. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." _Id_. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986); _First Nat'l Bank of Arizona v. Cities Serv. Co._, 391 U.S. 253, 288-89 (1968); _Ruffin v. County of Los Angeles_, 607 F.2d

1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 242 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P.

1  56(e) advisory committee's note on 1963 amendments); <u>International</u>

2  <u>Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405

3  (9th Cir. 1985).

4      In resolving the summary judgment motion, the court examines

5  the pleadings, depositions, answers to interrogatories, and

6  admissions on file, together with the affidavits, if any.  Rule

7  56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d

8  1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party

9  is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable

10  inferences that may be drawn from the facts placed before the court

11  must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S.

12  at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

13  (1962) (per curiam)); <u>Abramson v. Univ. of Haw.</u>, 594 F.2d 202, 208

14  (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the

15  air, and it is the opposing party's obligation to produce a factual

16  predicate from which the inference may be drawn.  <u>Richards v.</u>

17  <u>Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

18  <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

19      Finally, to demonstrate a genuine issue, the opposing party

20  "must do more than simply show that there is some metaphysical

21  doubt as to the material facts. . . . Where the record taken as a

22  whole could not lead a rational trier of fact to find for the

23  nonmoving party, there is no 'genuine issue for trial.'"

24  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

25  ////

26  ////

1                          **III. ANALYSIS**

2    **A.   Plaintiff Carmichael Elks' Claim**

3         Carmichel Elks claims that Leonard's publication of the

4    "Leonard Guides" infringes on copyrights held by the Lodge.  The

5    basic elements of a claim for copyright infringement are (1)

6    ownership of a valid copyright in a work and (2) copying of

7    protected elements from that work.  <u>Feist Publ'ns, Inc. v. Rural</u>

8    <u>Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991); <u>Cavalier v. Random</u>

9    <u>House, Inc.</u>, 297 F.3d 815, 822 (9th Cir. 2002).  In addition,

10   registration of the copyright, while "not a prerequisite to a valid

11   copyright, . . . is a prerequisite to suit." <u>S.O.S., Inc. v.</u>

12   <u>Payday, Inc.</u>, 886 F.2d 1081, 1085 (9th Cir. 1989) (citing 17 U.S.C.

13   §§ 408(a), 411).[5]     Therefore, to succeed on a claim for

14   infringement, a plaintiff must show (1) that the plaintiff is the

15   owner of the subject copyright, (2) that the copyright has been

16   registered, and (3) that the defendant has infringed on protected

17   elements of the copyrighted work.

18        In this case, the court begins with the second step, looking

19   to whether the assertedly infringed-upon work has been registered.

20   In subpart III(A)(1) below, the court concludes that Carmichael

21   Elks' only valid registrations are those pertaining to the 1988

22   editions of Elkdom Travel Guides I and II.  Because Carmichael Elks

23   is the undisputed owner of the copyrights in these works,

24   discussion of ownership is unnecessary.  Accordingly, in subpart

25   _____

26        [5] There is an exception to this rule, not relevant here, for
     "work of visual art."  17 U.S.C. §§ 411(a), 106A.

                                     14

III(A)(2), the court turns to which elements, if any, of these works are both eligible for copyright protection and have been impermissibly copied by Leonard's guides.[6]

1. **Carmichael Elks' Registrations of Copyrights**

   a. **The 1988 Registrations of Guides I and II**

Carmichael Elks registered Elkdom Travel Guides I and II in 1988, and did not register any subsequent editions of these guides. Leonard does not dispute the validity of the 1988 registrations.

Carmichael Elks argue that the 1988 registrations effectively registered subsequent editions of Guides I and II as well. This argument does not lie. Registration of a work does not extend to future works derived from the registered work.[7] Well-Made Toy Mfg.

---

[6] Ninth Circuit cases have not always approached the problem in this way. For example, some cases first look to whether the work contains copyrightable elements in the abstract or in discussion of the first step (ownership of a copyright), only then turning to whether copyrightable elements have been infringed upon. See, e.g., Ets-Hokin v. Skyy Spirits, 225 F.3d 1068, 1076 (9th Cir. 2000). Other cases have discussed protectability largely as part of the infringement analysis. See, e.g., Cavalier, 297 F.3d at 822; see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) (concluding that the first step of this test, "ownership of a valid copyright," was satisfied as by the concession that the work contained at least some copyrightable elements, and then discussing copyrightablility of particular elements as part of the infringement analysis). See also Apple Computer v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994) (articulating a yet another process, in three steps, for evaluation of infringement claims). Although all approaches lead to the same result, it appears to the court that the Cavalier approach is both more common and better suited to this case, and the court adopts it here.

[7] A derivative work is one that "'would be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of a copyright proprietor of such preexisting work.'" Mirage Editions, Inc. v. Albuquerque A.R.T. Co., 856 F.2d 1341, 1343 (9th Cir. 1988)

1  Corp. v. Goffa Int'l Corp., 354 F.3d 112, 115 (2d Cir. 2003).

2  Accordingly, when a plaintiff registers one work, creates a

3  derivative of that work, and then claims that a third work created

4  by another person infringes on the derivative, the requirement of

5  registration as a prerequisite to suit may not be satisfied.  Id.

6  In such a situation, an infringement action will succeed only if

7  the third work copied from the unregistered derivative elements

8  that were also present in the registered original.  In such a case,

9  the plaintiff effectively brings a claim for infringement of the

10 original.  See, e.g., Montgomery v. Noga, 168 F.3d 1282, 1292-93

11 (11th Cir. 1999); see also Russell v. Price, 612 F.2d 1123, 1128

12 (9th Cir. 1979) ("[t]he established doctrine prevents unauthorized

13 copying or other infringing use of the underlying work or any part

14 of that work contained in the derivative product so long as the

15 underlying work itself remains copyrighted."), Dalton-Ross Homes,

16 Inc. v. Williams, 2007 U.S. Dist. LEXIS 64135, *7 (D. Ariz. Aug.

17 29, 2007).  Therefore, Carmichael Elks may base a claim for

18 infringement on the 1988 editions of Elkdom Travel Guides I and II,

19 but not on unregistered derivative works, including future editions

20 _____

21 (quoting 1 Nimmer on Copyright § 3.01 (1986)).  See also 17 U.S.C.
   § 101.
22     In a separate argument, Carmichael Elks assert that they "own
   any contributions supplied by [Leonard] as derivative works."  This
23 is incorrect.  As noted, a derivative work is one that includes
   protected elements from an earlier work.  However, a derivative
24 work might also include novel protectable elements.  In such a
   case, ownership of the novel elements in the derivative is not
25 automatically transferred to the owner of the original.  See 17
   U.S.C. § 201(a) (copyright initially vests in the author of a
26 work).

1  of these guides.

2         **b.    The 2007 Registration of Elkdom Travel Guide III**

3         On March 21, 2007, Carmichael Elks filed for registration of

4  Elkdom Travel Guide III.  Compl. Ex. C.  Leonard contends that this

5  registration  is  defective,  and  therefore  cannot  support  an

6  infringement action.

7         17 U.S.C. section 409 provides the requirements for an

8  application  for  copyright  registration.   These  requirements

9  include, inter alia, the names of the authors, an explanation as

10  to how the claimant came to own the copyright (if the claimant is

11  not the author), dates of prior publication of the work, and "in

12  the case of a compilation or derivative work, an identification of

13  any preexisting work or works that it is based on or incorporates,

14  and a brief, general statement of the additional material covered

15  by the copyright claim being registered."  17 U.S.C. §§ 409(2),

16  (5),  (8),  (9).   The  registration  application  form  used  by

17  Carmichael  Elks  also  specifically  inquires  as  to  whether

18  "registration for this work, or for an earlier version of this

19  work, [has] already been made in the Copyright Office," and

20  requests details of any such prior registrations.  "The knowing

21  failure to advise the Copyright Office of facts that might have

22  occasioned a rejection of the application constitutes reason for

23  holding the registration invalid and thus incapable of supporting

24  an infringement action, or to deny enforcement on the ground of

25  unclean hands."  <u>Fleming v. Miles</u>, 181 F. Supp. 2d 1143, 1154 (D.

26  Or. 2001); <u>see also</u> <u>Harris v. Emus Records Corp.</u>, 734 F.2d 1329,

1   1335 (9th Cir. 1984) ("inaccuracies in copyright registration,"

2   when prejudicial or intended to defraud, may bar an action for

3   infringement.)

4        Although this court finds <u>Fleming</u> to be a persuasive statement

5   of the law, it is also clear that an application for registration

6   need not include all information that might conceivably result in

7   the application's rejection.  The possibility that the information

8   would cause rejection must cross some threshold.  This court need

9   not decide precisely where that threshold lies, because two

10  omissions here, regarding Leonard's authorship and registrations

11  of the work, undoubtedly surpass any plausible threshold.

12       The application submitted by Carmichael Elks identifies the

13  work to be copyrighted as the March 6, 2006 edition of Elkdom

14  Travel Guide III.  Carmichael Elks identified Ira and Barbara David

15  as the authors of this 2006 edition of Elkdom Travel Guide III,

16  although the Davids had ceased contributing to the guides in 1992.

17  The application omitted any reference to Leonard as a possible

18  author.  "As a general rule, the author is the party who actually

19  creates the work, that is, the person who translates an idea into

20  a fixed, tangible expression entitled to copyright protection."

21  <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989)

22  (citing 17 U.S.C. § 102).  In a similar omission, the application

23  notes the 1988 registrations of Elkdom Travel Guides I and II, but

24  does not refer to Leonard's application for registration and

25  registration of the guides.  If none of the work authored by

26  Leonard was of a kind entitled to protection, and if Leonard's

18

1  prior registration was invalid, then Carmichael Elks might have
2  been entitled to registration of this copyright. However, there
3  were serious questions as to the propriety of the Carmichael Elks'
4  registration attempt. The undisputed evidence establishes that at
5  the time of registration, Carmichael Elks was aware of these
6  disputes, and Carmichael Elks nonetheless failed to inform the
7  copyright office of these issues. Accordingly, as explained by
8  Fleming, Carmichael Elks' registration of Elkdom Travel Guide III
9  cannot support a claim for infringement. 181 F. Supp. 2d at 1154.
10 Any infringement claim brought by the Carmichael Elks must
11 therefore be based solely on the versions of Elkdom Travel Guides
12 I and II registered in 1988.

13      **2.    Copying of Protected Elements**

14      Because ownership of the copyrights in Elkdom Travel Guides
15 I and II is undisputed, the remaining step in the infringement
16 analysis is whether "defendant copied protected elements of the
17 work." Cavalier, 297 F.3d at 822. A plaintiff may prevail on this
18 step by showing "that the infringer had access to plaintiff's
19 copyrighted work and that the works at issue are substantially
20 similar in their protected elements." Id. Access and similarity
21 are on a sliding scale, such that when a defendant has greater
22 access, the Ninth Circuit accepts "a lower standard of proof of
23 substantial similarity." Swirsky v. Carey, 376 F.3d 841, 844 (9th
24 Cir. 2004). However, while a strong showing of access may offset
25 a weak showing of similarity, the standard for protectability is
26 constant. Thus, even where direct, verbatim copying has occurred,

1  there is no infringement unless the copied elements are the type

2  protected by copyright.  <u>Feist</u>, 499 U.S. at 364, <u>Matthew Bender</u>,

3  158 F.3d at 689.

4      In this case, access has been clearly shown, and the dispute

5  therefore concerns "substantial[] similar[ity] [of] protected

6  elements." For this, the Ninth Circuit uses yet another two part

7  test, in which a plaintiff must show both "extrinsic" and

8  "intrinsic" similarity. <u>Cavalier</u>, 297 F.3d at 822; <u>Apple Computer</u>

9  <u>v. Microsoft Corp.</u>, 35 F.3d 1435, 1442 (9th Cir. 1994). The

10 "extrinsic" part of this test objectively looks to whether the

11 protectable elements of the works are similar. The "intrinsic"

12 part of this test "is a subjective comparison that focuses on

13 whether the ordinary, reasonable audience would find the works

14 substantially similar in the total concept and feel of the works."

15 <u>Id.</u> Extrinsic similarity is a question of fact that may, in some

16 circumstances, be resolved on summary judgment, but intrinsic

17 similarity is a factual question that must be left to the jury.

18 <u>Id.</u> at 824. Therefore, the issue on this motion is whether

19 Carmichael Elks have provided evidence sufficient to support a

20 finding that Leonard's "Elk RV Travel Guides" include elements that

21 are substantially similar to the protectable elements, if any, of

22 the 1988 editions of Elkdom Travel Guides I and II. If not,

23 Leonard is entitled to summary judgment dismissing this claim.

24     Under the extrinsic test, "A court must take care to inquire

25 only whether the *protectible elements, standing alone*, are

26 substantially similar. Therefore, when applying the extrinsic

1  test, a court must filter out and disregard the non-protectible

2  elements in making its substantial similarity determination."

3  Cavalier, 297 F.3d at 822 (emphasis in original).  The court

4  reviews the scope of copyright protection before turning to the

5  application of the extrinsic similarity test to this case.

6              **a.    Scope of Copyright Protection**

7         Copyright does not protect bare "ideas" or "facts." Cavalier,

8  297 F.3d at 823 (citing Berkic v. Crichton, 761 F.2d 1289, 1293-94

9  (9th Cir. 1985)); see also 17 U.S.C. § 102(b).  Although "[i]t may

10 seem unfair" that certain elements may be copied with impunity,

11 "this is not 'some unforseen byproduct of a statutory scheme.'"

12 Feist, 499 U.S. at 349 (quoting Harper & Row, Publrs. v. Nation

13 Enters., 471 U.S. 539, 589 (1985) (dissenting opinion)).   The

14 constitution provides the power "to promote the Progress of Science

15 and useful Arts," Art. I, § 8, cl. 8, and Congress has determined

16 that the law best serves this purpose when it "encourages others

17 to build freely upon the ideas and information conveyed by a work."

18 Feist, 499 U.S. at 350.  Although neither facts nor ideas are

19 copyrightable, copyright protects particular expressions of ideas

20 and creativity in the compilation of facts, as explained in the

21 following two sections.  17 U.S.C. § 103(b); Feist, 499 U.S. at

22 344, CDN Inc. v. Kapes, 197 F.3d 1256, 1259 (9th Cir. 1999).

23            **i.    The Idea/Expression Distinction**

24       The expression of an idea, but not the idea itself, may be

25 eligible for copyright protection.  Cavalier, 297 F.3d at 823

26 (citing 17 U.S.C. § 102(b)).  This limit applies to preclude

21

copyright protection of an "idea" regardless of whether the idea
is original or the product of creativity.  Although the distinction
between an idea and an expression thereof is imprecise, numerous
Ninth Circuit cases illustrate the distinction's application.  For
example, in discussing claims by Apple Computer that Microsoft
infringed on Apple's copyrights for design of computer interfaces,
the Ninth Circuit held that many elements of the interface were
ideas not subject to copyright protection, including "the idea of
a graphical user interface, or the idea of a desktop metaphor" for
such an interface, "use of windows to display multiple images on
the computer screen and to facilitate user interaction with the
information contained in the windows; iconic representation of
familiar objects from the office environment; manipulation of icons
to convey instructions and to control operation of the computer;
use of menus to store information or computer functions in a place
that is convenient to reach, but saves screen space for other
images; and opening and closing of objects as a means of
retrieving, transferring and storing information." Apple Computer,
35 F.3d at 1443-44.  In a later case concerning a guide to coin
prices, the Ninth Circuit explained that an author cannot protect

> [the] idea of creating a wholesale price
> guide, but [the author] can use the copyright
> laws to protect its idea of what those prices
> are.  Drawing this line preserves the balance
> between competition and protection: it allows
> [the author's] competitors to create their own
> price guides and thus furthers competition,
> but protects [the author's] creation, thus
> giving it an incentive to create such a guide.

1   <u>CDN Inc. v. Kapes</u>, 197 F.3d 1256, 1262 (9th Cir. 1999).[8]  In a

2   third illustration of the idea/expression distinction, concerning

3   a claim for infringement of a copyright in a television show

4   demonstrating magic tricks, the Ninth Circuit explained that "while

5   similarities in tangible expressive elements . . . are pertinent

6   to our analysis, the mere fact that both The Mystery Magician and

7   the Specials reveal the secrets behind magic tricks does not by

8   itself constitute infringement." <u>Rice v. Fox Broad. Co.</u>, 330 F.3d

9   1170, 1175 (9th Cir. 2003). <u>See also</u> <u>Satava v. Lowry</u>, 323 F.3d

10  805, 811 (9th Cir. 2003) ("no copyright protection may be afforded

11  to the idea of producing a glass-in-glass jellyfish sculpture or

12  to elements of expression that naturally follow from the idea of

13  such a sculpture.").

14                    **ii.  Factual Compilations**

15      Roughly similar to the way in which an idea may not be

16  copyrighted but its expression may be, facts many not be

17  copyrighted, but their creative and original selection or

18  arrangement in a factual compilation may be.  "A 'compilation' is

19  a work formed by the collection and assembling of preexisting

20  materials or of data that are selected, coordinated, or arranged

21

_____

22      [8] The <u>CDN</u> court's conclusion that the prices themselves were
    copyrightable has little bearing on this case.  The court concluded
23  that the prices included in the guide were "estimates" that could
    not be formulaically calculated, and that each individual price was
24  therefore itself the result of a creative process.  197 F.3d at
    1260.  Accordingly, the prices themselves were eligible for
25  copyright protection, notwithstanding the <u>CDN</u> court's separate
    discussion of cases dealing with compilations of individually
26  unprotectable facts.  <u>Id.</u>

in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.  To be eligible for protection, this selection or arrangement must be made independently by the compiler and entail a minimum degree of creativity.  Feist, 499 U.S. at 361.  Creativity and originality are the sole issues; whether discovery or collection of facts "takes much time and effort is wholly irrelevant to whether the . . . work is copyrightable." CDN, 197 F.3d at 1260 (citing Feist, 499 U.S. at 349).  "Copyright rewards originality, not effort." Feist, 499 U.S. at 364.[9]  The Supreme Court has explained that:

> the originality requirement is not particularly stringent. . . . Originality requires only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work), and that it display some minimal level of creativity. Presumably, the vast majority of compilations will pass this test, but not all will.  There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent.

Feist, 499 U.S. at 358-59.  A majority of courts treat the question of whether given facts demonstrate the requisite creativity as a question of law, although this court is not aware of a Ninth Circuit or the Supreme Court decision directly speaking to the issue.  See Mid Am. Title Co. v. Kirk, 59 F.3d 719, 722 (7th Cir.

---

[9] However, not all originality is rewarded or protected by the copyright system.  As explained above, ideas are not protected, regardless of their originality, and Feist did not change this rule.  Rice, 330 F.3d at 1175 (applying, after Feist was decided, the idea/expression distinction).

24

1995), <u>BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g</u>,
999 F.2d 1436, 1444 (11th Cir. 1993); <u>but see</u> <u>Matthew Bender & Co.
v. West Publ'g Co.</u>, 158 F.3d 674, 681 (2d Cir. 1998) ("the question
of whether particular elements of a work demonstrate sufficient
originality and creativity to warrant copyright protection [is] a
question for the factfinder.").[10]   I adopt the majority approach
here.

     For the selection or arrangement of facts to be creative, the
author must make "non-obvious choices from among more than a few
options." <u>Matthew Bender & Co. v. West Publ'g Co.</u>, 158 F.3d 674,
683 (2d Cir. 1998).  External factors may eliminate options, and
demonstrate that a choice among the remaining options was not
creative.  <u>Id.</u>, <u>Mid Am. Title Co. v. Kirk</u>, 59 F.3d 719, 722 (7th
Cir. 1995).  In this circumstance, a subsequent publisher may take
the work of the compiler.

     In <u>Mid Am. Title Co.</u>, the plaintiff claimed infringement of
a compilation of selected land title data.  59 F.3d at 721.  The
Seventh Circuit held that the selection of this data was "a matter

---

[10] Outside the factual compilation context, the Ninth Circuit
has held that "Issues involving the availability and extent of
copyright protection . . . present mixed questions of law and
fact." <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197,
201 (9th Cir. 1989).   In <u>CDN</u>, the Ninth Circuit cited <u>Harper
House</u>, but <u>CDN</u> did not explain whether the <u>Feist</u> question of
whether selection and arrangement of facts that are not themselves
eligible for copyright was or was not a question of law.  Instead,
<u>CDN</u> merely cited <u>Harper House</u> for the proposition that the question
of whether prices were facts was reviewed de novo.  197 F.3d at
1259 n.1.  As explained above, this determination differs from the
question of whether selection of uncopyrightable facts is
sufficiently creative.

of convention and strict industry standards." Id. at 722. All individuals preparing a similar document "ultimately would have selected the same facts to include." Id. In particular, because external forces required that the plaintiff "list all facts which affect marketable title, there was no room for creativity in determining which liens or which encumbrances to include in the title commitment." Id. at 723.

In Matthew Bender, the Second Circuit considered the selection and arrangement of information in publication of federal court opinions. 158 F.3d at 683. Plaintiffs sought a declaratory judgment that certain elements of West Publishing Company's formatting of Court of Appeals and Supreme Court opinions were not eligible for copyright protection. The Second Circuit held that the selection and arrangement of certain information was so limited by external factors that no creativity was involved. As to the parties' names, the deciding court, and the dates of argument and decision, the selection of these facts for inclusion was compelled by these facts' importance, and selection was not a function of West's creativity. Id. at 683. As to the arrangement of information regarding subsequent appellate history before the same court--amendments, rehearings, opinions related to rehearing en banc--the court held that there would almost never be more than "one or two realistic or useful options" as to how to arrange this information, and that the choice among these options would be dictated by the form of the later decision and its timing relative to the printing of the reporter. Id. at 685. Similarly, "the

1    standard of the legal profession" determined the use of parallel
2    or alternative citations, leaving no room for the exercise of
3    creativity.  Id.

4         Even when multiple options for selection or arrangement are
5    available, the choice from among those options must be non-obvious
6    in order to be protectable.  In Feist, the Supreme Court held that
7    the selection of information published in a phone book--a person's
8    name, town, and telephone number--"could not be more obvious." 499
9    U.S. at 362.[11]  The alphabetical listing of names was equally
10   obvious and therefore uncopyrightable.  Id. at 363.  In a similar
11   case, the Eleventh Circuit concluded that the arrangement of
12   listings in a yellow pages directory under categories such as
13   "attorneys" and "banks," or the division of "churches by
14   denomination or attorneys by area of specialty," was obvious for
15   purposes of Feist.  BellSouth Adver. & Publ'g Corp. v. Donnelley
16   Info. Publ'g, 999 F.2d 1436, 1444 (11th Cir. 1993).

17        The above factors may preclude a finding of creativity even
18   when they reduce the range of options to very few, but not a
19   single, choice for selection or arrangement.  Matthew Bender, 158
20   F.3d at 687-88.  In such a scenario, affording copyright protection
21   to the choice may make it impossible for future authors to avoid
22   infringement.  Id.  When options are so constrained, the choice of
23   any one option is not creative.  Id.

24   _____

25        [11] Although common practice is to include addresses in phone
     directories, it is not as clear to this court as it was to the
26   Supreme Court in Feist that addresses form a necessary component
     of a phone book.  Nonetheless, this court is bound by Feist.

1    In contrast, when the choices for selection or arrangement are

2    not so constrained, the choice among them may demonstrate

3    protectable creativity or "exercise of judgment." Key Publ'ns,

4    Inc. v. Chinatown Today Pub. Enters, Inc., 945 F.2d 509, 513 (2d

5    Cir. 1991). Key Publications concerned a business directory for

6    New York's Chinese-American community. Id. at 511. The Second

7    Circuit held that both the selection and arrangement of information

8    demonstrated creativity. The selection was creative because, at

9    the minimum, the directory's author excluded "businesses she did

10   not think would remain open for very long, such as certain

11   insurance brokers, take-out restaurants, and traditional Chinese

12   medical practitioners," and identification of these business

13   required creative judgment. Id. at 513. The arrangement of

14   listings within the directory was creative because it involved

15   creation of categories "of particular interest to the

16   Chinese-American community and not common to yellow pages, e.g.,

17   'BEAN CURD & BEAN SPROUT SHOPS.'"[12] Id. at 514.

18       In another opinion concluding that the selection of facts for

19   inclusion in a compilation was creative, the Second Circuit

20   considered selection of baseball pitching statistics. Kregos v.

21

_____

22       [12] However, under Ninth Circuit precedent, the decision to
     create a Chinese-American business directory is an idea that is not
23   copyrightable. Rice, 330 F.3d at 1175. If, once this decision is
     made, external factors dictate the inclusion of a category for
24   "bean curd and bean sprout shops," adoption of this category is not
     creative. The Second Circuit in Key Publications did not address,
25   and this court does not profess to know, whether this particular
     category is so obvious to New York's Chinese-American community as
26   to demonstrate an absence of creativity.

28

1  *Associated Press*, 937 F.2d 700 (2d Cir. 1991).  The compilation

2  used nine statistics for each player.  *Id.* at 702.  This particular

3  combination had not been previously used, and one of these

4  statistics had not be used in any prior compilation.  *Id.* at 703.

5  The defendant had moved for summary judgment on the ground that

6  this selection was not copyrightable.  *Id.*  The Second Circuit

7  upheld the district court's denial of defendant's motion.  Where

8  "there are at least scores of available statistics about pitching

9  performance available . . . and therefore thousands of combinations

10  of data that a selector can choose . . . . It cannot be said as a

11  matter of law that in selecting the nine items . . . [plaintiff]

12  has failed to display enough selectivity to satisfy the requirement

13  of originality."  *Id.* at 704.

14         **b.  Substantial Similarity of Protected Elements in The**

15                    **Elkdom Travel Guides**

16      In this case, Carmichael Elks argue that the 1988 editions of

17  Elkdom Travel Guides I and II demonstrate the requisite creativity

18  in selection and arrangement of the information to be included, as

19  well as in the notes accompanying some entries, and that Leonard

20  has infringed upon these elements.[13]  The court considers these

21

22       [13] Carmichael Elks also argue that the maps included in the
original guides are eligible for copyright protection.  Leonard

23  does not dispute this, and instead argues that there is no
similarity between the protectable elements of the Carmichael Elks

24  maps and the maps used in Leonard's guides.  Carmichael Elks
implicitly concede this point--they argue that Leonard's maps

25  contain public domain information and information that is not
eligible to copyright, but Carmichael Elks identify no similarities

26  between Leonard's maps and theirs.

1  choices separately.

2                   i.    **Selection of Categories of Information**

3       Carmichael Elks argue that the selection of categories of

4  information included is entitled to protection.  Before addressing

5  this argument, the court notes that the decision to publish a

6  travel guide for Elks is an idea that is not itself copyrightable,

7  as it is akin to the idea to create a show that explains magic

8  tricks, or a guide to the prices of coins.  Rice, 330 F.3d at 1175,

9  CDN, 197 F.3d at 1262.

10      Carmichael Elks therefore may not use copyright law to prevent

11 others from publishing such a similar guide--now that Carmichael

12 Elks have come up with the idea, copyright law encourages others

13 to build upon it.  Feist, 499 U.S. at 350.  Thus, the Carmichael

14 Elks cannot protect the selection of information that would be

15 necessary or obvious in any travel guide for Elks.  See, e.g.,

16 Matthew Bender, 158 F.3d at 683, 685.  For this reason, the guides'

17 inclusion of the following information for each lodge is not

18 protectable: city name, lodge number, phone number and address.

19 Inclusion of meeting times, dining room hours, and bar hours was

20 also obvious in light of the guide's purpose.  The submitted

21 evidence indicates that the needs of the guides' intended readers

22 compelled the inclusion of meeting times, dining room hours, and

23 bar hours, and Carmichael Elks, who bears the burden of proof on

24 this issue at trial, has not submitted any evidence supporting a

25 contrary conclusion.  Matthew Bender, 158 F.3d at 685.  Selection

26 of this information is therefore obvious (if not necessary) and

                                  30

1   non-creative.

2      Carmichael Elks also argue that the decision to include
3   information for RV travelers is entitled to copyright protection.
4   Plainly, not all Elks travel by RV.  Accordingly, the decision to
5   include such information in the general guide was not compelled by
6   external circumstances.  The decision to include this information,
7   as opposed to any other information regarding any of the other
8   amenities that appeal to only subsets of Elks travelers, may
9   "display [the] minimal level of creativity" required by the Supreme
10  Court in <u>Feist</u>.  499 U.S. at 358-59.  However, this decision--to
11  include RV information in a guide for general Elks travelers--was
12  not copied by Leonard.  Instead, Leonard has published a series of
13  guides specifically for Elks RV travelers.  Leonard's "Elk RV
14  Travel Guides" do not include entries for Elks lodges without RV
15  facilities, instead listing these lodges only in an abbreviated
16  appendix.  Thus, although Carmichael Elks may have displayed a
17  modicum of creativity in determining that a general audience of
18  Elks would appreciate RV information, Leonard did not appropriate
19  this creative judgment, because he instead published guides
20  specific to RV travel.  Accordingly, there is not a material
21  question regarding the substantial similarity with respect to this
22  selection of RV information in general.

23     Although there is no similarity regarding this general
24  decision, Leonard did copy the selection of particular categories
25  of RV information for inclusion--RV parking availability, fees,
26  hookups for electricity, water and dumping, and existence of an RV

1   club.  Carmichael Elks argue that the selection of these specific

2   categories  is  subject  to  copyright  protection.    Although  the

3   creativity or judgment involved in selection of these categories

4   is hardly overwhelming, Carmichael Elks have demonstrated that

5   other travel guides including RV information do not all include

6   these  categories  of  information,  and  that  other  guides  often

7   include other categories not found in the Elkdom Travel guides.

8   Accordingly,  while  selection  of  these  categories  may  not  be

9   entitled to significant protection, they exceed the low threshold

10  adopted  by  <u>Feist</u>  and  illustrated  by  the  above-cited  cases.

11  Moreover,  all  of  the  Elk  RV  Travel  Guides  include  these  exact

12  categories of RV travel information, such that a jury could find

13  that substantial similarity exists with regard to this protectable

14  element.  Accordingly, Leonard's motion for summary judgment as to

15  Carmichael Elks' claim must be denied on this ground.

16                  **ii.  Arrangement of Information**

17      The decisions to group the entries by state, to arrange states

18  alphabetically,  and  to  arrange  cities  within  each  state

19  alphabetically are all obvious and under the cases ineligible for

20  copyright protection.[14]  The arrangement of information within each

21  entry (in the 1988 Guides, within each "tile") is, under the cases,

22  equally uncreative.  Some aspects of this intra-entry arrangement,

23  _____

24      [14] Carmichael Elks argue that the decision to arrange the
    lodges alphabetically by city, rather than in order of lodge
    number, demonstrates creativity.  Even if the court were to accept
25  that contention that the numerical organization was viable, the
    range of available options is too small for the selection of an
26  alphabetical arrangement to be protectable.

                                    32

such as the arrangement of information regarding electricity,
water, and dumping RV hookups, are arbitrary, and do not reflect
the exercise of creative judgment.  <u>Key Publ'ns</u>, 945 F.2d at 513.
To the extent that the arrangement does reflect judgment, the
arrangement is obvious, such as the choice to list the name of the
city first, or to list whether there is RV parking before listing
whether there are hookups for RVs.  Accordingly, neither the
arrangement of entries within the guides nor the arrangement of
information within each entry is copyrightable.  The court wishes
to be clear that this conclusion has no bearing on its separate
conclusion that selection of this information for inclusion is
potentially subject to copyright.

    The court does not address whether the graphical layout of the
guides--in "landscape" format or in a square of tiles--represents
a copyrightable arrangement, because Leonard did not copy these
elements.

### iii. Notes

    Carmichael Elks have also demonstrated a question of material
fact as to whether Leonard's Elk RV Travel Guides I and II have
infringed upon the notes included in Elkdom Travel Guides I and II.
Carmichael Elks identify notes for seven Colorado cities for which
Elk RV Travel Guide II includes a note that is either similar to,
or a verbatim copy of, the note included in the Elkdom Travel Guide
II.  These notes identify the nearest major cross streets, provide
added information about the location of the lodge, and/or identify
alternative RV parking and available RV facilities.  Pl.'s Mem.

1  Opp. Mot. Summ. J., 21:18 - 22:4.  Carmichael Elks contend that
2  these examples drawn from Colorado listings are representative of
3  the similarities in all states included in Guides I and II.
4  Leonard does not challenge the representativeness of these
5  examples, instead arguing that the these notes are not protectable.

6      At least some of these notes reflect creative judgment. Notes
7  of this type are provided only for some lodges.  The decision as
8  to when to include a note of this type involved the "minimal level
9  of creativity" required by <u>Feist</u>, such that these notes are
10  protectable.  499 U.S. at 358-59.  For example, although this court
11  must conclude that inclusion of certain information about the
12  lodges themselves is obvious, the identification of information
13  about alternative RV facilities is not.

14      Nor can the court conclude that the selection of facts
15  included in Leonard's Elk RV Travel Guides I and II is as a matter
16  of law dissimilar under the extrinsic test.  Because of Leonard's
17  access to the guides, only a low degree of proof of similarity is
18  needed.  <u>Swirsky</u>, 376 F.3d at 844.  Thus, a trier of fact may
19  conclude that Leonard's selection is similar because it includes
20  many of the same notes, despite the fact that Leonard also added
21  and omitted some notes.

22      **3.   Summary of Carmichael Elks' Claim**

23      For the reasons stated above, the court grants Leonard's
24  motion for summary judgment as to Carmichael Elks claim for
25  infringement insofar as the claim is based on infringement of the
26  originally registered editions of Elkdom Travel Guides I and II.

34

1   Carmichael Elks's selection of which types of RV information to
2   include was a creative judgment that is eligible for copyright
3   protection.  Material questions of fact exist as to whether all of
4   Leonard's Elks RV Travel Guides are substantially similar to the
5   Carmichael Elks' Elkdom Travel Guides I and II in this regard under
6   the extrinsic test, such that both extrinsic and intrinsic
7   similarity must be decided by the trier of fact.  Separately, the
8   court concludes that at least some notes included in Elkdom Travel
9   Guides I and II are eligible for protection, and that triable
10  questions exist as to whether Leonard's Elks RV Travel Guides I and
11  II are substantially similar in this regard.

12  **B.   Leonard's Counterclaim**

13       Leonard also moves for summary judgment on his counterclaim
14  for infringement of the copyrights he registered in 2007.  Leonard
15  argues that Carmichael Elks copied notes and maps he created;
16  Leonard does not claim any protected interest in the selection of
17  general categories of information or in the arrangement of his
18  guides.   Despite the narrowness of this counterclaim, the
19  counterclaim raises similar issues of the registrations' validity,
20  protectability of Leonard's work, and infringement.  Carmichael
21  Elks also argue that Leonard worked under a work-for-hire
22  arrangement, such that ownership of any copyrightable work created
23  by Leonard initially vested in the Lodge, and not Leonard.  The
24  court does not address these issues, because Carmichael Elks have
25  demonstrated a triable question as to whether Leonard is equitably
26  estopped from bringing this claim.  Therefore, Leonard's motion for

1  summary judgment as to this claim must be denied.

2      Equitable estoppel is available as a defense to copyright

3  infringement actions.  Hampton v. Paramount Pictures Corp., 279

4  F.2d 100 (9th Cir. 1960), Pamfiloff v. Giant Records, Inc., 794

5  F. Supp. 933, 937 (N.D. Cal. 1992), 4-13 Melville B. Nimmer & David

6  Nimmer, Nimmer on Copyright § 13.07 (2008).  This form of estoppel

7  is a defense in which plaintiff's past conduct bars the plaintiff

8  from asserting certain rights.  Although a party may be equitably

9  estopped from bringing a suit for copyright infringement, either

10 for past or future uses of the protected work, estoppel cannot

11 effect a transfer of "ownership of the copyright which originally

12 vested in the works' authors."  Pamfiloff, 794 F. Supp. at 937.

13     In a copyright infringement action, four elements are

14 necessary to establish estoppel: "(1) The party to be estopped must

15 know the facts; (2) he must intend that his conduct shall be acted

16 on or must so act that the party asserting the estoppel has a right

17 to believe it is so intended; (3) the latter must be ignorant of

18 the true facts; and (4) he must rely on the former's conduct to his

19 injury."  Hampton, 279 F.2d 100, 104 (9th Cir. 1960); accord United

20 States v. King Features Entertainment Inc., 843 F.2d 394, 399 (9th

21 Cir. 1988).  This test, so formulated, does not differ from the

22 more general approach to estoppel in this circuit.  Tellingly, King

23 Features cited Bob's Big Boy Family Rests. v. N.L.R.B., 625 F.2d

24 850, 854 (9th Cir. 1980), a non-copyright case, as authority for

25 the elements of estoppel in a copyright infringement action.  King

26 Features, 843 F.2d at 399.

                          36

1    In this case, Leonard argues that the Carmichael Elks' use of

2    Leonard's works prior to March 31, 2007 was permissive, and that

3    Leonard's conduct during this time could not estopp Leonard from

4    revoking such permission and then enforcing his copyright through

5    an infringement action arising out of the Elk's use of Leonard's

6    material after March 31, 2007.   Leonard bases this argument on

7    Professor Nimmer's phrasing of the elements of estoppel in an

8    infringement action, and in particular, Nimmer's phrasing of the

9    first element.   Citing <u>Hampton</u>, 279 F.2d 100, Nimmer states that

10   the first element is that "the plaintiff must know the facts of *the*

11   *defendant's infringing conduct*."   4-13 Nimmer on Copyright § 13.07

12   (emphasis added).   Leonard argues that because there was no

13   infringing conduct prior to Leonard's revocation of permission,

14   Leonard's conduct prior to this time cannot satisfy the first

15   element of the estoppel test.[15]

16   Contrary to Leonard's argument, courts that have considered

17   the issue have held that a copyright owner's conduct during a

18   period of permissive use may estopp the owner from later revoking

19   permission and bringing an infringement claim.   <u>Carson v. Dynegy,</u>

20   <u>Inc.</u>, 344 F.3d 446, 453 (5th Cir. 2003), <u>DeCarlo v. Archie Comic</u>

21   <u>Publ'ns</u>, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001), <u>Quinn v.</u>

22

23        [15] More fully, Leonard argues that "anything Leonard did prior
24   to January 19, 2007 [the date on which Leonard sent a letter
     revoking permission to use his works] is irrelevant because there
     was no infringement prior to that date.   Without such infringement,
25   subsequent acquiescence to the infringement, the infringer's
     ignorance of the infringement claim, and reliance on the copyright
26   owner's acquiescence, there can be no estoppel."   Def.'s Reply, 14.

1  City of Detroit, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998).
2  Leonard's reading of Nimmer is belied by the fact that Nimmer cites
3  these cases for this proposition.  For example, Nimmer explains
4  Carson as a case where an "employee who previously consented to his
5  company's exploitation of the subject work . . . . [was] estopped
6  to complain post-termination about the company's continued usage
7  of his work."  4-13 Nimmer on Copyright § 13.07.  Alternatively,
8  to the extent that Nimmer's statement that the owner must have had
9  knowledge of "the infringing conduct" does compel Leonard's
10 conclusion that infringement must predate the conduct giving rise
11 to estoppel, Nimmer is at variance with the Ninth Circuit test for
12 estoppel in infringement actions.  King Features, 843 F.2d at 399,
13 Hampton, 279 F.2d at 104.  Neither King Features nor Hampton used
14 Nimmer's language, nor did either case discuss such a requirement.
15 Instead, King Features demonstrated that the normal test for
16 estoppel applies by citing Bob's Big Boy Family Restaurants, which
17 considered an estoppel argument raised in the context of a labor
18 dispute.  King Features, 843 F.2d at 399.

19      Having rejected the rule proposed by Leonard, the court turns
20 to the application of the ordinary estoppel factors.  Because the
21 Ninth Circuit has not considered analogous facts, the court bases
22 this analysis on Carson, DeCarlo and Quinn, each of which applied
23 an estoppel framework consistent with the Ninth Circuit's decisions
24 in King Features and Hampton.

25      In Carson, the plaintiff had created a copyrightable
26 spreadsheet while employed by defendant.  344 F.3d at 448.  This

1  spreadsheet was authored and owned by plaintiff.  Plaintiff had
2  encouraged other defendant's employees to use the spreadsheet.  Id.
3  at 499.  Plaintiff was later fired for unrelated reasons.  Id. at
4  450.  When the defendant continued to use the spreadsheet,
5  plaintiff brought a claim for copyright infringement.  Id.  When
6  defendant moved for summary judgment on the ground that plaintiff
7  was estopped from bringing this claim, plaintiff argued that
8  defendant could not satisfy the first, third, and fourth elements
9  of the test for estoppel.  Id. at 453 (quoting the Nimmer
10  formulation of the elements of estoppel).

11      The Fifth Circuit affirmed the grant of summary judgment,
12  concluding that all of the elements of estoppel were satisfied.
13  The first element was satisfied by plaintiff's knowledge of
14  defendant's use of the spreadsheet.  Id. at 455.  The Fifth Circuit
15  specifically rejected the argument that the plaintiff must have had
16  knowledge of infringing use of the spreadsheet, instead holding
17  that knowledge of non-infringing use during the period of
18  employment was sufficient.  Id. at 455 n.9 (citing Basic Books,
19  Inc. v. Kinko's Graphics Corp., 758 F. Supp. 1522, 1540 (S.D.N.Y.
20  1991)).  Although the court stated that the second element was not
21  in dispute, the court's analysis implied that defendant's reliance
22  on plaintiff's conduct was reasonable in part because of the "clear
23  relationship" between the parties.  Id. at 455 n.9 (distinguishing
24  Steinberg v. Columbia Pictures Indus., Inc., 663 F. Supp. 706,
25  715-16 (S.D.N.Y. 1987)).  The third element was satisfied because
26  defendant was ignorant of the fact that plaintiff, rather than

1    defendant, owned the spreadsheet.  Id. at 453-54.  "[Plaintiff]

2    encouraged the adaptation, modification, and preparation of a

3    derivative program for other [Defendant's] employees to use.

4    [Plaintiff], . . . admitted that he never explicitly told anyone

5    that the worksheet could not be modified or used unless he was

6    present and he never appeared to correct the impression among some

7    of [Defendant's] employees that [the spreadsheet] was a

8    team-created program."  Id. at 453.  Although the Fifth Circuit

9    discussed plaintiff's encouragement of the creation of derivative

10   works as part of the third element, this fact also speaks to the

11   second and fourth elements.  Id.  Finally, the court held that the

12   fourth element could be satisfied by defendant's reliance on

13   plaintiff's conduct during the course of plaintiff's employment,

14   even though the alleged infringement only occurred after the

15   employment ended. Id. at 455.

16       The opinion in Carson drew heavily from an Eastern District

17   of Michigan opinion, Quinn v. City of Detroit, 23 F. Supp. 2d 741

18   (E.D. Mich. 1998).  Quinn also concerned a plaintiff who had

19   prepared a program while employed by defendant, who consented to

20   the employer's use of the program while the plaintiff was employed,

21   and who later revoked this consent upon his termination and claimed

22   that the defendant's continuing use of the program was infringing.

23   Id. at 743-44.  After a bench trial, the court concluded that

24   plaintiff was estopped from bringing this claim.  The four estoppel

25   factors were satisfied because plaintiff had known of the

26   defendant's use of the program, plaintiff had consented to such

40

1    use, and the defendant had detrimentally relied upon this consent

2    by abandoning the prior program.  Id. at 753, see also Carson, 344

3    F.3d at 454 (discussing Quinn).  The court did not separately

4    address the defendant's ignorance of the facts.  As explained in

5    Carson, Quinn therefore held that a plaintiff's conduct prior to

6    the alleged infringement may estopp a plaintiff from bringing an

7    infringement claim.

8        The Southern District of New York reached a similar result

9    in DeCarlo v. Archie Comic Publ'ns, Inc., 127 F. Supp. 2d 497

10   (S.D.N.Y. 2001).  Plaintiff DeCarlo was a comic book artist who had

11   drawn strips published by defendant.  Id. at 499.  Plaintiff

12   claimed that he owned the rights to a comic book character, and

13   that defendant had been granted only a limited license.  Id. at

14   501.  However, defendant had for years used the character in ways

15   exceeding the license plaintiff claimed to have granted, plaintiff

16   knew of this use, and plaintiff had not objected.  Id.  Plaintiff

17   then brought an infringement claim when defendant attempted to use

18   the character in a motion picture.  Id. at 502.  The court granted

19   summary judgment to  defendant on the ground of equitable estoppel.

20   First, "[plaintiff] indisputably knew that [defendant] conducted

21   itself as if it owned the rights that [plaintiff] now claims belong

22   to him."  Id. at 509.  Second, because of plaintiff's relationship

23   with defendant, plaintiff's silence and inaction in the face of

24   defendant's repeated use justified reliance on plaintiff's conduct.

25   Id. at 510.  "[I]t is immaterial to a claim of estoppel that there

26   was no actual attempt to defraud or mislead."  Id. (quoting CBS,

41

1  Inc. v. Stokely-Van Camp, Inc., 522 F.2d 369 (2d Cir. 1975)).

2  Third, defendant believed that it possessed the disputed rights to

3  the character, and was ignorant of the fact that plaintiff claimed

4  such rights.  Id. at 511.  Fourth, defendant relied on plaintiff's

5  conduct by entering a movie production deal and agreeing to

6  indemnify the other party from copyright infringement claims prior

7  to plaintiff's assertion of ownership.  Because defendant had

8  repeatedly asserted ownership over the work, and plaintiff failed

9  "ever to voice a complaint or make a competing claim in the face

10 of numerous opportunities to do so," defendant had "the right to

11 rely on [plaintiff's] silence."  Id. at 511.

12      In this case, the evidence permits a trier of fact[16] to

13 conclude that the first three estoppel elements, as interpreted by

14 these cases, are satisfied.  The first is satisfied because Leonard

15 both knew of Carmichael Elks' use of the guides, Carson, 344 F.3d

16 at 451; Quinn, 23 F. Supp. 2d at 753, and of Carmichael Elks'

17 belief that they owned the copyright to them, DeCarlo, 127 F. Supp.

18 2d at 509.  The second element is satisfied by Leonard's affixation

---

20      [16] For purposes of this motion, the court need not resolve
    whether the trier of fact for these questions will be the jury or
21  the court.  However, to inform the parties' future briefing, the
    court notes that because estoppel is an equitable defense, "except
22  for any issues which may be common to . . . legal claims, [an]
    equitable estoppel defense presents issues to be resolved by the
23  court."  Granite States Ins. Co. v. Smart Modular Techs., 76 F.3d
    1023, 1026-28 (9th Cir. 1996).  When legal claims tried to a jury
24  raise factual questions that overlap with the estoppel questions,
    "the legal claims involved in the action must be determined prior
25  to any final court determination of the equitable claims."  Id. at
    1027 (internal quotations and modification omitted).  In this
26  order, the court does not decide whether such common issues exist.

1    a copyright notice stating that the Carmichael Elks owned the work,

2    Leonard's implicit consent to the Elks' use of the work, Leonard's

3    longstanding relationship with the Carmichael Elks, and his

4    knowledge of the Elks' belief regarding copyright.  Carson, 344

5    F.3d at 455 n.9, DeCarlo, 127 F. Supp. 2d at 510.  Third, for

6    years, Carmichael Elks were ignorant of Leonard's claim to

7    ownership in the guides.  Carson, 344 at 453-54, DeCarlo, 127 F.

8    Supp. 2d at 511.

9        As to the fourth element, the evidence would enable a trier

10   of fact to conclude that during this period of ignorance,

11   Carmichael Elks reasonably relied upon Leonard's consent to use the

12   copyrighted notes, as Carmichael Elks passed information received

13   from Elks lodges and members on to Leonard to incorporate, rather

14   than incorporating this information themselves.  A trier of fact

15   could conclude that this reliance was detrimental insofar as it

16   prevented the Carmichael Elks from incorporating these notes into

17   a work actually owned by the Lodge.  This form of detriment is

18   analogous to the abandonment of a prior software system in Quinn,

19   23 F. Supp. 2d at 755.  Carmichael Elks has a similar, although

20   weaker, claim to detrimental reliance on Leonard's maps.  Because

21   Leonard incorporated these maps into the Elkdom Travel Guides,

22   Carmichael Elks will suffer expense if they are required to remove

23   these maps from the hundreds of pages in the current publications.

24   Such expense will accrue even if the Carmichael Elks merely replace

25   Leonard's maps with the former handwritten ones.  Because Leonard

26   had repeatedly caused these notes and maps to be published under

1  the Carmichael Elks' copyright notice, the court cannot conclude

2  as a matter of law that Carmichael Elks did not reasonably and

3  detrimentally rely on Leonard's conduct.

4      Therefore, a trier of fact could conclude that Leonard's

5  conduct prior to his 2007 assertion of ownership of the copyright

6  in the 2006 editions of the Elkdom Travel Guides estopps Leonard

7  from bringing an infringement action against the Carmichael Elks

8  regarding their use of these guides.  Estoppel applies not only to

9  the Carmichael Elks' prior use of these guides, but also

10  prospectively.  Accordingly, Leonard's motion for summary judgment

11  as to this claim must be denied.

12                        **IV. CONCLUSION**

13      For the reasons stated above, defendant and counter-claimant

14  Leonard's motion for summary judgment, Doc. No. 38, is DENIED, both

15  as to plaintiff's claim and as to defendant's counterclaim.

16  Pursuant to Fed. R. Civ. P. 56(d)(1), the court GRANTS partial

17  summary adjudication to defendant Leonard as to plaintiff's

18  infringement claim, concluding that this claim may proceed solely

19  insofar as it alleges infringement based on copying of the

20  selection of particular categories of RV information and of notes

21  included in the registered versions of Elkdom Travel Guides I and

22  II.

23      IT IS SO ORDERED.

24      DATED:  September 15, 2009.

25

26                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
                                UNITED STATES DISTRICT COURT

                                44