UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CARMICHAEL LODGE NO. 2103,
BENEVOLENT AND PROTECTIVE
ORDER OF ELKS OF THE UNITED
STATES OF AMERICA, a
California corporation,

                                    NO. CIV. S-07-2665 LKK/GGH

        Plaintiff,

     v.
                                         O R D E R

RONALD L. LEONARD dba RV TRAVEL
GUIDES, a California company,
and DOES 1 through 50,
inclusive,


        Defendants.

_____/

     The core of this action is a copyright dispute between
plaintiff/counterdefendant Carmichael Lodge No. 2103, Benevolent
and Protective Order of Elks of the United States of America
("Carmichael Elks" or "Lodge") and defendant/counter-claimant
Ronald Leonard, d/b/a RV Travel Guides. Carmichael Elks filed suit
alleging that Leonard has infringed on the Lodge's copyrights
regarding various travel guides.  Leonard has brought various

1

counterclaims, including a claim that the Carmichael Elks is infringing on copyrights owned by Leonard for portions of the same guides. Pending before the court is Leonard's motion for summary adjudication as to these two cross copyright infringement claims. Carmichael Elks have not filed a cross motion as to either claim.

## I. BACKGROUND[1]

Carmichael Elks is a California corporation and the local chapter of a national fraternal organization, the Benevolent and Protective Order of Elks of the United States of America. Defendant and counterclaimant Ron Leonard is an individual presently residing in Carmichael, California. Leonard was a member of the Carmichael Elks from 1998 until July 11, 2008. Although Leonard's departure from the Carmichael Elks appears to be based on the circumstances underlying the instant copyright infringement claims, the facts of his departure do not influence the present motion.

## A.   The Elkdom Travel Guides

The parties' dispute concerns a series of travel guides. In or about 1984, two members of the Carmichael Elks, Ira and Barbara David, began creating a series of "Elkdom Travel Guides." These guides contain information about Elks lodges, accompanied by some

---

[1] Leonard has lodged objections to several items of evidence relied on by Carmichael Elks. Some of this evidence is not necessary to the resolution of the instant motion--including the portions of the deposition transcript challenged by Leonard's seventh objection. As to objections one through six, to the extent that the evidence objected to is relevant and the court has relied on it, those objections are OVERRULED.

2

1   maps, directions, and notes regarding points of interest. While the

2   guides include RV travel information, they include all Elks lodges

3   regardless of whether RV facilities are available.  Carmichel Elks

4   claims a protected interest in Elkdom Travel Guides I through III.

5       In 1988, Carmichel Elks obtained copyright registrations for

6   Elkdom Travel Guides I and II,  Registration Nos. TX-2-522-753 and

7   TX-2-522-754.  "Elkdom Travel Guide I" was originally published in

8   1984,  and  contains  information  regarding  seven  Pacific  Coast

9   states.  "Elkdom Travel Guide II" was initially published in 1986,

10  and pertains to eleven states east of those encompassed by Guide

11  I  and  west  of  the  Mississippi  River.[2]   The  1988  copyright

12  registrations indicate that Ira and Barbara David authored these

13  guides, but that the Davids assigned ownership of the copyrights

14  to the Carmichael Elks.

15      Elkdom  Travel  Guide  III,  pertaining  to  nine  southeastern

16  states,   was   not   included   with   these   initial   copyright

17  registrations.  Instead, Guide III was first published in or about

18  1991.  Carmichel Elks did not seek to register a copyright for

19  this guide until 2007, after the facts underlying this dispute had

20  already arisen.

21      Guides  I  through  III  follow  the  same  format.   Prior  to

22  Leonard's involvement in the guides, the guides were oriented in

23  a landscape or horizontal format, with the Elks logo and the badge

24

25      [2] This guide encompasses Montana, North Dakota, South Dakota,
    Wyoming, Nebraska, Utah, Colorado, Kansas, Oklahoma, New Mexico and
    Texas.   The parties curiously label this grouping of states as
26  "Midwestern."

1   for the Carmichael Elks on the cover.  The guides were divided into
2   a section for each state, arranged alphabetically.  Each section
3   provided information for cities that had an Elks lodge,
4   alphabetized by city name.  The pages were divided in half
5   vertically and horizontally, generating four "tiles," with
6   information for each city presented in a single tile.  This
7   information included the Elk's lodge number, phone number, address,
8   meeting times, dinner hours, and bar hours.  Each tile also
9   explained whether the lodge featured RV parking, applicable parking
10  fees if any, the availability of water, electric, and dumping
11  hookups, and whether the lodge had an RV club.  Finally, each tile
12  included a section which could contain directions, miscellaneous
13  information, or a small map.  Miscellaneous information included
14  notations regarding lodge events such as bingo nights, regular
15  menus (e.g., "Fish & Chicken Fri night"), and whether the lodge,
16  instead of being a dedicated building, was another facility used
17  for meetings (e.g., "Lodge meets at Vally Nat'l Bank Building on
18  Coronado Blvd.").  Maps, if included, were simplified, including
19  only major highways and streets, represented by straight lines of
20  uniform thickness, and noting the location of the lodge.

21      From 1984 through 1992, these three guides were authored and
22  updated by Barbara and Ira David.  During this time, other
23  Carmichael Elks lodge members, primarily Muriel and Forrest Wright,
24  were responsible for the printing and distribution.  In 1992, the
25  Davids ceased participating in the production or updating of the
26  guides.

**B.    Leonard's Initial Involvement with Guides I through III**

In or about 1998, Leonard, then a member of the Carmichael Elks, began working on the guides.  Leonard updated the guides by contacting the listed lodges to validate the information contained in the guides.  Relatedly, Leonard added to the notes for various lodges, incorporating information that was conveyed to him by Forrest Wright (who in turn received information from travelers) and that Leonard received over the internet.  Deposition of Forrest Wright 38:5-15.  Leonard put this information into his own words.  Declaration of Ronald Leonard Supp. Def.'s Mot. Summ. J., ¶ 3.  Leonard also performed word processing and desktop publishing tasks.  After Leonard began working on the guides, the guides switched from a landscape to a portrait layout, and switched from using four tiles on each page to four rows.  Lastly, he replaced the maps, using curved lines to represent roads, thicker lines to represent freeways, signifying highways and freeways by presenting the road number in a symbol overlaying the line rather than with text, and by using a star symbol rather than a box to indicate the location of the lodge.  These changes were first reflected in guides printed in 2000.  In performing the above, Leonard used information contained in prior versions of the Elkdom Travel Guides, but exclusively relied upon online mapping tools for creating the maps.

During this time, Forrest Wright continued to manage the printing and distribution of the guides.  Mr. Wright also conveyed information from lodges and Elks travelers to Leonard to be

1  included in the guide.  On at least one issue, Mr. Wright exercised
2  control over the content of the guides.  Leonard suggested
3  abbreviating the information regarding lodges that did not provide
4  parking for RVs, a change that would make the guides more RV-
5  centric, but Wright rejected this suggestion.[3]  Wright Dep., 41:9 -
6  43:7.  Other than the various Elks members who submitted the
7  information that was included in the guides, no other individuals
8  were directly involved in the production of the content for Guides
9  I through III.

10  Leonard did not receive monetary compensation aside from
11  reimbursement of printing expenses.  Leonard never executed any
12  written agreement regarding ownership of his contributions to the
13  guides.  Leonard updated the guides in this manner until April of
14  2007.

15  **C.   Elkdom Travel Guide IV**

16  Separate from the above three guides, in or about June 1996,
17  Carmichael Elks granted Gulf Coast Lodge No. 2782, located in Gulf
18  Shores, Alabama, the right to publish Elkdom Travel Guides covering
19  specified Northeastern States.  Compl. ¶¶ 15-16.  The Gulf Coast
20  Lodge published Elkdom Travel Guide IV, covering these states,
21  until October 13, 2005. At that time, the Gulf Coast Lodge entered
22  an agreement with Carmichael Elks wherein the Gulf Coast Lodge
23  returned the right to publish Elkdom Travel Guide IV to Carmichael
24  Elks in exchange for an agreement to pay royalties to the Gulf

25  ─────────────
26  [3] As noted below, Leonard would later implement this change
in the guides he published separately.

6

1    Coast Lodge.  Despite this development, Carmichael Elks has not
2    published the fourth guide.  In May of 2006, Leonard entered into
3    a separate arrangement with the Alabama lodge to publish Elkdom
4    Travel Guide IV without the involvement of Carmichael Elks.

5    **D.   Leonard's Claim to Copyright in the Guides**

6         The Elkdom Travel Guides published from 2000 to 2006 bore a
7    notice stating that the copyright for the guides was owned by
8    Carmichael Elks.  At some point in 2006, Leonard replaced this
9    notice with one stating that the copyright was owned by RV Travel
10   Guides, e.g., "Copyright © 2000, 2001, 2002, 2003, 2004, 2005,
11   2006; RV Travel Guides, Sacramento, CA."  R. Leonard Decl. Ex. A
12   (May 12, 2006, deposit copy of Elkdom Travel Guide I).  This change
13   did not occur uniformly.  For example, the "deposit copy" of Elkdom
14   Travel Guide I submitted in connection with Leonard's copyright
15   registration includes the above internal statement, and the cover
16   of this guide also indicates that the copyright is owned by RV
17   Travel Guides.  R. Leonard Decl. Ex. A.  However, in the November
18   28, 2006 printing of Elkdom Travel Guide I, the cover states "©
19   BPOE Lodge 2103, Carmichael, CA" while the first page includes the
20   RV Travel Guides copyright statement.  See Deposition of Ronald
21   Leonard, 97:8-98:4.

22        On January 9, 2007, Leonard applied to register copyrights for
23   the May 12, April 16, March 6, and October 1 2006 editions Elkdom
24   Travel Guides I through IV, respectively.  Registration Nos. TX
25   6-585-010, TX 6-585-011, TX 6-585-012, TX 6-585-013 Compl. Ex. D-G.
26   Leonard used a "short form" application provided by the Copyright

1  Office.  This form required that he specify the "year of creation"

2  for the subject work.   On each form, Leonard answered "2000,"

3  although Leonard now declares that this was in error, such that the

4  works were created in the years he provided as their initial

5  publication.  Leonard indicated that he was the sole author of each

6  work and owner of each copyright.  The short form did not inquire

7  as to whether there were any prior registrations of the subject

8  works.

9      Both parties have introduced copies of Leonard's registration

10  forms, all of which bear a "certificate of registration" from the

11  Copyright Office indicating that the registrations became effective

12  on January 9, 2007.  Carmichael Elks state that these registrations

13  were nonetheless not granted by the Copyright Office until some

14  time after March 2, 2007, but Carmichael Elks have not introduced

15  any evidence to this effect.[4]

16  _____

17      [4] Carmichael Elks state in their opposition memo that on March
    2, 2007, Alden Almquist, a copyright examiner, sent a letter
18  explaining the following:

19          We are delaying registration because this work
            contains preexisting material, and the Short
20          Form application your [sic] used does not have
            space to distinguish old and new material.
21          When a new work contains material that has
            been either previously registered or
22          published, or that is in the public domain,
            the copyright claim must be limited to the new
23          copyrightable authorship that has been added.
            In such cases, the application should describe
24          both preexisting material and the added
            material in the space provided for this
25          information.  This information is required
            regardless of whether you or someone else
26          published the preexisting material, or whether
            the preexisting material is copyrighted or in

8

1    On January 19, 2007, Leonard wrote a letter to Carmichael Elks

2 stating that

3               effective 3-31-2007, I am withdrawing
               permission to use my copyrighted format and
4               maps used in Elkdom Travel Guides I, II and
               III, which I created and have registered with
5               the US Library of Congress Copyright Office.
               My copyright extends only to the format
6               (layout) of the Guides, and to the maps which
               I created, so perhaps another editor/publisher
7               can be found who will prepare and use a
               different format.

8

9 R. Leonard Decl. Ex. E.

10 **E.   Carmichael Elks' 2007 Registration of Elkdom Travel Guide III**

11    On March 27, 2007, Carmichael Elks filed to register a

12 copyright for the then-current edition of Elkdom Travel Guide III.

13 The certificate of registration lists Ira and Barbara David as the

14 authors of this guide, and does not mention Leonard.  Nor does the

15 certificate mention the registrations filed by Leonard on January

16 of 2007, or otherwise refer to the dispute regarding these

17 materials.

18 **E.   Subsequent Sale of the Guides**

19    On or about April 2007, Leonard began to sell the guides

20 independently, under the title "Elk RV Travel Guides."   In

21 ─────────────────────

                the public domain.
22

23 This purported quote appears in Carmichael Elks' opposition
memorandum and complaint, but not in any evidence submitted by
Carmichael Elks.

24    While the Carmichael Elks contend that Leonard's registrations
became effective at a later date, they have not provided any
25 explanation as to why the application forms indicate that the
registration became effective on January 9, 2007, or on what later
26 date the registrations took effect.

9

1  preparing these guides, Leonard also added latitude, longitude and
2  elevation information for each lodge, removed the Elks logo from
3  the cover, revised and added some notes, and revised the format of
4  the guides to list lodges that do not offer RV parking at the end
5  of each section in an abbreviated form.  R. Leonard Decl. Ex. F-H.

6      Since March 2007 Carmichael Elks have continued to sell
7  versions of Guides I, II, and III that are based on the last
8  versions Leonard contributed to before the dispute arose.  Wright
9  Dep. 74:10-17.  The versions sold by Carmichael Elks are nearly
10 identical to the versions for which Leonard obtained copyright
11 registrations, with only minor revisions consisting of updates to
12 some of the lodge information.  See Exhibits H-M to the Declaration
13 of Mark Leonard Supp. Def.'s Mot. Summ. J.  As of April 27, 2009
14 the Carmichael Elks were still referring customers for Leonard
15 Guide IV to Leonard. M. Leonard Decl. Ex. A (Wright Depo. 98:15-23)

16        **II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

17     Summary judgment is appropriate when it is demonstrated that
18 there exists no genuine issue as to any material fact, and that the
19 moving party is entitled to judgment as a matter of law.  Fed. R.
20 Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157
21 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467
22 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr
23 v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th
24 Cir. 1984).

25     Under summary judgment practice, the moving party
26 ////

                                 10

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d

11

1  1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

2      In attempting to establish the existence of this factual
3  dispute, the opposing party may not rely upon the denials of its
4  pleadings, but is required to tender evidence of specific facts in
5  the form of affidavits, and/or admissible discovery material, in
6  support of its contention that the dispute exists.   Rule 56(e);
7  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at
8  289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).   The
9  opposing party must demonstrate that the fact in contention is
10 material, i.e., a fact that might affect the outcome of the suit
11 under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.
12 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.
13 Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
14 dispute is genuine, i.e., the evidence is such that a reasonable
15 jury could return a verdict for the nonmoving party, Anderson, 242
16 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
17 (9th Cir. 1987).

18     In the endeavor to establish the existence of a factual
19 dispute, the opposing party need not establish a material issue of
20 fact conclusively in its favor.  It is sufficient that "the claimed
21 factual dispute be shown to require a jury or judge to resolve the
22 parties' differing versions of the truth at trial."  First Nat'l
23 Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus,
24 the "purpose of summary judgment is to 'pierce the pleadings and
25 to assess the proof in order to see whether there is a genuine need
26 for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P.

1  56(e) advisory committee's note on 1963 amendments); <u>International</u>
2  <u>Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405
3  (9th Cir. 1985).

4         In resolving the summary judgment motion, the court examines
5  the pleadings, depositions, answers to interrogatories, and
6  admissions on file, together with the affidavits, if any.   Rule
7  56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d
8  1301, 1305-06 (9th Cir. 1982).   The evidence of the opposing party
9  is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable
10 inferences that may be drawn from the facts placed before the court
11 must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S.
12 at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655
13 (1962) (per curiam)); <u>Abramson v. Univ. of Haw.</u>, 594 F.2d 202, 208
14 (9th Cir. 1979).   Nevertheless, inferences are not drawn out of the
15 air, and it is the opposing party's obligation to produce a factual
16 predicate from which the inference may be drawn.   <u>Richards v.</u>
17 <u>Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
18 <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

19        Finally, to demonstrate a genuine issue, the opposing party
20 "must do more than simply show that there is some metaphysical
21 doubt as to the material facts. . . . Where the record taken as a
22 whole could not lead a rational trier of fact to find for the
23 nonmoving party, there is no 'genuine issue for trial.'"
24 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).
25 ////
26 ////

1                        **III. ANALYSIS**

2  **A.   Plaintiff Carmichael Elks' Claim**

3       Carmichel Elks claims that Leonard's publication of the

4  "Leonard Guides" infringes on copyrights held by the Lodge.  The

5  basic elements of a claim for copyright infringement are (1)

6  ownership of a valid copyright in a work and (2) copying of

7  protected elements from that work.  <u>Feist Publ'ns, Inc. v. Rural</u>

8  <u>Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991);  <u>Cavalier v. Random</u>

9  <u>House, Inc.</u>, 297 F.3d 815, 822 (9th Cir. 2002).  In addition,

10 registration of the copyright, while "not a prerequisite to a valid

11 copyright, . . . is a prerequisite to suit."  <u>S.O.S., Inc. v.</u>

12 <u>Payday, Inc.</u>, 886 F.2d 1081, 1085 (9th Cir. 1989) (citing 17 U.S.C.

13 §§ 408(a), 411).[5]   Therefore, to succeed on a claim for

14 infringement, a plaintiff must show (1) that the plaintiff is the

15 owner of the subject copyright, (2) that the copyright has been

16 registered, and (3) that the defendant has infringed on protected

17 elements of the copyrighted work.

18      In this case, the court begins with the second step, looking

19 to whether the assertedly infringed-upon work has been registered.

20 In subpart III(A)(1) below, the court concludes that Carmichael

21 Elks' only valid registrations are those pertaining to the 1988

22 editions of Elkdom Travel Guides I and II.  Because Carmichael Elks

23 is the undisputed owner of the copyrights in these works,

24 discussion of ownership is unnecessary.  Accordingly, in subpart

25 ─────────────────

26      [5] There is an exception to this rule, not relevant here, for
    "work of visual art."  17 U.S.C. §§ 411(a), 106A.

                                14

1   III(A)(2), the court turns to which elements, if any, of these

2   works are both eligible for copyright protection and have been

3   impermissibly copied by Leonard's guides.[6]

4       **1.   Carmichael Elks' Registrations of Copyrights**

5           **a.   The 1988 Registrations of Guides I and II**

6       Carmichael Elks registered Elkdom Travel Guides I and II in

7   1988, and did not register any subsequent editions of these guides.

8   Leonard does not dispute the validity of the 1988 registrations.

9       Carmichael Elks argue that the 1988 registrations effectively

10  registered subsequent editions of Guides I and II as well.  This

11  argument does not lie.  Registration of a work does not extend to

12  future works derived from the registered work.[7]  Well-Made Toy Mfg.

13  _____

14      [6] Ninth Circuit cases have not always approached the problem
    in this way.  For example, some cases first look to whether the

15  work contains copyrightable elements in the abstract or in
    discussion of the first step (ownership of a copyright), only then

16  turning to whether copyrightable elements have been infringed upon.
    See, e.g., Ets-Hokin v. Skyy Spirits, 225 F.3d 1068, 1076 (9th Cir.

17  2000).  Other cases have discussed protectability largely as part
    of the infringement analysis.  See, e.g., Cavalier, 297 F.3d at

18  822; see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S.
    340, 361 (1991) (concluding that the first step of this test,

19  "ownership of a valid copyright," was satisfied as by the
    concession that the work contained at least some copyrightable

20  elements, and then discussing copyrightablility of particular
    elements as part of the infringement analysis).  See also Apple

21  Computer v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994)
    (articulating a yet another process, in three steps, for evaluation

22  of infringement claims).  Although all approaches lead to the same
    result, it appears to the court that the Cavalier approach is both

23  more common and better suited to this case, and the court adopts
    it here.

24      [7] A derivative work is one that "'would be considered an
    infringing work if the material which it has derived from a

25  preexisting work had been taken without the consent of a copyright
    proprietor of such preexisting work.'"  Mirage Editions, Inc. v.

26  Albuquerque A.R.T. Co., 856 F.2d 1341, 1343 (9th Cir. 1988)

1  _Corp. v. Goffa Int'l Corp._, 354 F.3d 112, 115 (2d Cir. 2003).

2  Accordingly, when a plaintiff registers one work, creates a

3  derivative of that work, and then claims that a third work created

4  by another person infringes on the derivative, the requirement of

5  registration as a prerequisite to suit may not be satisfied.  _Id._

6  In such a situation, an infringement action will succeed only if

7  the third work copied from the unregistered derivative elements

8  that were also present in the registered original.  In such a case,

9  the plaintiff effectively brings a claim for infringement of the

10 original.  _See, e.g._, _Montgomery v. Noga_, 168 F.3d 1282, 1292-93

11 (11th Cir. 1999); _see also_ _Russell v. Price_, 612 F.2d 1123, 1128

12 (9th Cir. 1979) ("[t]he established doctrine prevents unauthorized

13 copying or other infringing use of the underlying work or any part

14 of that work contained in the derivative product so long as the

15 underlying work itself remains copyrighted."), _Dalton-Ross Homes,_

16 _Inc. v. Williams_, 2007 U.S. Dist. LEXIS 64135, *7 (D. Ariz. Aug.

17 29, 2007).   Therefore, Carmichael Elks may base a claim for

18 infringement on the 1988 editions of Elkdom Travel Guides I and II,

19 but not on unregistered derivative works, including future editions

20 ────────────────

21 (quoting 1 Nimmer on Copyright § 3.01 (1986)).  _See also_ 17 U.S.C.
   § 101.

22     In a separate argument, Carmichael Elks assert that they "own
   any contributions supplied by [Leonard] as derivative works."  This

23 is incorrect.  As noted, a derivative work is one that includes
   protected elements from an earlier work.  However, a derivative

24 work might also include novel protectable elements.  In such a
   case, ownership of the novel elements in the derivative is not

25 automatically transferred to the owner of the original.  _See_ 17
   U.S.C. § 201(a) (copyright initially vests in the author of a

26 work).

1   of these guides.

2          **b.   The 2007 Registration of Elkdom Travel Guide III**

3          On March 21, 2007, Carmichael Elks filed for registration of

4   Elkdom Travel Guide III.  Compl. Ex. C.  Leonard contends that this

5   registration is defective, and therefore cannot support an

6   infringement action.

7          17 U.S.C. section 409 provides the requirements for an

8   application for copyright registration.  These requirements

9   include, inter alia, the names of the authors, an explanation as

10  to how the claimant came to own the copyright (if the claimant is

11  not the author), dates of prior publication of the work, and "in

12  the case of a compilation or derivative work, an identification of

13  any preexisting work or works that it is based on or incorporates,

14  and a brief, general statement of the additional material covered

15  by the copyright claim being registered."  17 U.S.C. §§ 409(2),

16  (5), (8), (9).  The registration application form used by

17  Carmichael Elks also specifically inquires as to whether

18  "registration for this work, or for an earlier version of this

19  work, [has] already been made in the Copyright Office," and

20  requests details of any such prior registrations.  "The knowing

21  failure to advise the Copyright Office of facts that might have

22  occasioned a rejection of the application constitutes reason for

23  holding the registration invalid and thus incapable of supporting

24  an infringement action, or to deny enforcement on the ground of

25  unclean hands."  <u>Fleming v. Miles</u>, 181 F. Supp. 2d 1143, 1154 (D.

26  Or. 2001); <u>see also</u> <u>Harris v. Emus Records Corp.</u>, 734 F.2d 1329,

17

1335 (9th Cir. 1984) ("inaccuracies in copyright registration,"
when prejudicial or intended to defraud, may bar an action for
infringement.)

Although this court finds <u>Fleming</u> to be a persuasive statement
of the law, it is also clear that an application for registration
need not include all information that might conceivably result in
the application's rejection.  The possibility that the information
would cause rejection must cross some threshold.  This court need
not decide precisely where that threshold lies, because two
omissions here, regarding Leonard's authorship and registrations
of the work, undoubtedly surpass any plausible threshold.

The application submitted by Carmichael Elks identifies the
work to be copyrighted as the March 6, 2006 edition of Elkdom
Travel Guide III.  Carmichael Elks identified Ira and Barbara David
as the authors of this 2006 edition of Elkdom Travel Guide III,
although the Davids had ceased contributing to the guides in 1992.
The application omitted any reference to Leonard as a possible
author.  "As a general rule, the author is the party who actually
creates the work, that is, the person who translates an idea into
a fixed, tangible expression entitled to copyright protection."
<u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989)
(citing 17 U.S.C. § 102).  In a similar omission, the application
notes the 1988 registrations of Elkdom Travel Guides I and II, but
does not refer to Leonard's application for registration and
registration of the guides.  If none of the work authored by
Leonard was of a kind entitled to protection, and if Leonard's

1    prior registration was invalid, then Carmichael Elks might have

2    been entitled to registration of this copyright.  However, there

3    were serious questions as to the propriety of the Carmichael Elks'

4    registration attempt.  The undisputed evidence establishes that at

5    the time of registration, Carmichael Elks was aware of these

6    disputes, and Carmichael Elks nonetheless failed to inform the

7    copyright office of these issues.  Accordingly, as explained by

8    <u>Fleming</u>, Carmichael Elks' registration of Elkdom Travel Guide III

9    cannot support a claim for infringement.  181 F. Supp. 2d at 1154.

10   Any infringement claim brought by the Carmichael Elks must

11   therefore be based solely on the versions of Elkdom Travel Guides

12   I and II registered in 1988.

13        **2.   Copying of Protected Elements**

14        Because ownership of the copyrights in Elkdom Travel Guides

15   I and II is undisputed, the remaining step in the infringement

16   analysis is whether "defendant copied protected elements of the

17   work."  <u>Cavalier</u>, 297 F.3d at 822.  A plaintiff may prevail on this

18   step by showing "that the infringer had access to plaintiff's

19   copyrighted work and that the works at issue are substantially

20   similar in their protected elements."  <u>Id.</u>  Access and similarity

21   are on a sliding scale, such that when a defendant has greater

22   access, the Ninth Circuit accepts "a lower standard of proof of

23   substantial similarity."  <u>Swirsky v. Carey</u>, 376 F.3d 841, 844 (9th

24   Cir. 2004).  However, while a strong showing of access may offset

25   a weak showing of similarity, the standard for protectability is

26   constant.  Thus, even where direct, verbatim copying has occurred,

1   there is no infringement unless the copied elements are the type
2   protected by copyright.   <u>Feist</u>, 499 U.S. at 364, <u>Matthew Bender</u>,
3   158 F.3d at 689.

4        In this case, access has been clearly shown, and the dispute
5   therefore concerns "substantial[] similar[ity] [of] protected
6   elements." For this, the Ninth Circuit uses yet another two part
7   test, in which a plaintiff must show both "extrinsic" and
8   "intrinsic" similarity. <u>Cavalier</u>, 297 F.3d at 822; <u>Apple Computer</u>
9   <u>v. Microsoft Corp.</u>, 35 F.3d 1435, 1442 (9th Cir. 1994).   The
10  "extrinsic" part of this test objectively looks to whether the
11  protectable elements of the works are similar.   The "intrinsic"
12  part of this test "is a subjective comparison that focuses on
13  whether the ordinary, reasonable audience would find the works
14  substantially similar in the total concept and feel of the works."
15  <u>Id.</u> Extrinsic similarity is a question of fact that may, in some
16  circumstances, be resolved on summary judgment, but intrinsic
17  similarity is a factual question that must be left to the jury.
18  <u>Id.</u> at 824.   Therefore, the issue on this motion is whether
19  Carmichael Elks have provided evidence sufficient to support a
20  finding that Leonard's "Elk RV Travel Guides" include elements that
21  are substantially similar to the protectable elements, if any, of
22  the 1988 editions of Elkdom Travel Guides I and II.   If not,
23  Leonard is entitled to summary judgment dismissing this claim.

24       Under the extrinsic test, "A court must take care to inquire
25  only whether the *protectible elements, standing alone*, are
26  substantially similar.   Therefore, when applying the extrinsic

1   test, a court must filter out and disregard the non-protectible
2   elements in making its substantial similarity determination."
3   Cavalier, 297 F.3d at 822 (emphasis in original).   The court
4   reviews the scope of copyright protection before turning to the
5   application of the extrinsic similarity test to this case.

6                    **a.   Scope of Copyright Protection**

7       Copyright does not protect bare "ideas" or "facts." Cavalier,
8   297 F.3d at 823 (citing Berkic v. Crichton, 761 F.2d 1289, 1293-94
9   (9th Cir. 1985)); see also 17 U.S.C. § 102(b).   Although "[i]t may
10  seem unfair" that certain elements may be copied with impunity,
11  "this is not 'some unforseen byproduct of a statutory scheme.'"
12  Feist, 499 U.S. at 349 (quoting Harper & Row, Publrs. v. Nation
13  Enters., 471 U.S. 539, 589 (1985) (dissenting opinion)).   The
14  constitution provides the power "to promote the Progress of Science
15  and useful Arts," Art. I, § 8, cl. 8, and Congress has determined
16  that the law best serves this purpose when it "encourages others
17  to build freely upon the ideas and information conveyed by a work."
18  Feist, 499 U.S. at 350.   Although neither facts nor ideas are
19  copyrightable, copyright protects particular expressions of ideas
20  and creativity in the compilation of facts, as explained in the
21  following two sections.   17 U.S.C. § 103(b); Feist, 499 U.S. at
22  344, CDN Inc. v. Kapes, 197 F.3d 1256, 1259 (9th Cir. 1999).

23                **i.   The Idea/Expression Distinction**

24      The expression of an idea, but not the idea itself, may be
25  eligible for copyright protection.   Cavalier, 297 F.3d at 823
26  (citing 17 U.S.C. § 102(b)).   This limit applies to preclude

1  copyright protection of an "idea" regardless of whether the idea

2  is original or the product of creativity.  Although the distinction

3  between an idea and an expression thereof is imprecise, numerous

4  Ninth Circuit cases illustrate the distinction's application.  For

5  example, in discussing claims by Apple Computer that Microsoft

6  infringed on Apple's copyrights for design of computer interfaces,

7  the Ninth Circuit held that many elements of the interface were

8  ideas not subject to copyright protection, including "the idea of

9  a graphical user interface, or the idea of a desktop metaphor" for

10 such an interface, "use of windows to display multiple images on

11 the computer screen and to facilitate user interaction with the

12 information contained in the windows; iconic representation of

13 familiar objects from the office environment; manipulation of icons

14 to convey instructions and to control operation of the computer;

15 use of menus to store information or computer functions in a place

16 that is convenient to reach, but saves screen space for other

17 images; and opening and closing of objects as a means of

18 retrieving, transferring and storing information."  Apple Computer,

19 35 F.3d at 1443-44.  In a later case concerning a guide to coin

20 prices, the Ninth Circuit explained that an author cannot protect

21          [the] idea of creating a wholesale price
           guide, but [the author] can use the copyright
22         laws to protect its idea of what those prices
           are.  Drawing this line preserves the balance
23         between competition and protection: it allows
           [the author's] competitors to create their own
24         price guides and thus furthers competition,
           but protects [the author's] creation, thus
25         giving it an incentive to create such a guide.

26

1  CDN Inc. v. Kapes, 197 F.3d 1256, 1262 (9th Cir. 1999).[8]  In a

2  third illustration of the idea/expression distinction, concerning

3  a claim for infringement of a copyright in a television show

4  demonstrating magic tricks, the Ninth Circuit explained that "while

5  similarities in tangible expressive elements . . . are pertinent

6  to our analysis, the mere fact that both The Mystery Magician and

7  the Specials reveal the secrets behind magic tricks does not by

8  itself constitute infringement." Rice v. Fox Broad. Co., 330 F.3d

9  1170, 1175 (9th Cir. 2003). See also Satava v. Lowry, 323 F.3d

10 805, 811 (9th Cir. 2003) ("no copyright protection may be afforded

11 to the idea of producing a glass-in-glass jellyfish sculpture or

12 to elements of expression that naturally follow from the idea of

13 such a sculpture.").

14                    ii.  Factual Compilations

15       Roughly similar to the way in which an idea may not be

16 copyrighted but its expression may be, facts many not be

17 copyrighted, but their creative and original selection or

18 arrangement in a factual compilation may be.  "A 'compilation' is

19 a work formed by the collection and assembling of preexisting

20 materials or of data that are selected, coordinated, or arranged

21

22       [8] The CDN court's conclusion that the prices themselves were
   copyrightable has little bearing on this case.  The court concluded
23 that the prices included in the guide were "estimates" that could
   not be formulaically calculated, and that each individual price was
24 therefore itself the result of a creative process.  197 F.3d at
   1260.  Accordingly, the prices themselves were eligible for
25 copyright protection, notwithstanding the CDN court's separate
   discussion of cases dealing with compilations of individually
26 unprotectable facts.  Id.

1   in such a way that the resulting work as a whole constitutes an

2   original work of authorship." 17 U.S.C. § 101.  To be eligible for

3   protection,   this   selection   or   arrangement   must   be   made

4   independently  by  the  compiler  and  entail  a  minimum  degree  of

5   creativity.  Feist, 499 U.S. at 361.  Creativity and originality

6   are  the  sole  issues;  whether  discovery  or  collection  of  facts

7   "takes much time and effort is wholly irrelevant to whether the .

8   . . work is copyrightable."  CDN, 197 F.3d at 1260 (citing Feist,

9   499 U.S. at 349).  "Copyright rewards originality, not effort."

10  Feist, 499 U.S. at 364.[9]  The Supreme Court has explained that:

11              the   originality   requirement   is   not
            particularly stringent. . . . Originality
12              requires  only  that  the  author  make  the
            selection or arrangement independently (i.e.,
13              without copying that selection or arrangement
            from another work), and that it display some
14              minimal level of creativity. Presumably, the
            vast majority of compilations will pass this
15              test, but not all will.  There remains a
            narrow category of works in which the creative
16              spark is utterly lacking or so trivial as to
            be virtually nonexistent.

17

18  Feist, 499 U.S. at 358-59.  A majority of courts treat the question

19  of whether given facts demonstrate the requisite creativity as a

20  question  of  law,  although  this  court  is  not  aware  of  a  Ninth

21  Circuit  or  the  Supreme  Court  decision  directly  speaking  to  the

22  issue.  See Mid Am. Title Co. v. Kirk, 59 F.3d 719, 722 (7th Cir.

23

24          [9] However, not all originality is rewarded or protected by the
    copyright system.  As explained above, ideas are not protected,
25  regardless of their originality, and Feist did not change this
    rule.  Rice, 330 F.3d at 1175 (applying, after Feist was decided,
26  the idea/expression distinction).

1  1995), <u>BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g</u>,

2  999 F.2d 1436, 1444 (11th Cir. 1993); <u>but see</u> <u>Matthew Bender & Co.</u>

3  <u>v. West Publ'g Co.</u>, 158 F.3d 674, 681 (2d Cir. 1998) ("the question

4  of whether particular elements of a work demonstrate sufficient

5  originality and creativity to warrant copyright protection [is] a

6  question for the factfinder.").[10]   I adopt the majority approach

7  here.

8      For the selection or arrangement of facts to be creative, the

9  author must make "non-obvious choices from among more than a few

10 options." <u>Matthew Bender & Co. v. West Publ'g Co.</u>, 158 F.3d 674,

11 683 (2d Cir. 1998).  External factors may eliminate options, and

12 demonstrate that a choice among the remaining options was not

13 creative.  <u>Id.</u>, <u>Mid Am. Title Co. v. Kirk</u>, 59 F.3d 719, 722 (7th

14 Cir. 1995).  In this circumstance, a subsequent publisher may take

15 the work of the compiler.

16     In <u>Mid Am. Title Co.</u>, the plaintiff claimed infringement of

17 a compilation of selected land title data.  59 F.3d at 721.  The

18 Seventh Circuit held that the selection of this data was "a matter

19

20     [10] Outside the factual compilation context, the Ninth Circuit
   has held that "Issues involving the availability and extent of
21 copyright protection . . . present mixed questions of law and
   fact."  <u>Harper House, Inc. v. Thomas Nelson, Inc.</u>, 889 F.2d 197,
22 201 (9th Cir. 1989).   In <u>CDN</u>, the Ninth Circuit cited <u>Harper
   House</u>, but <u>CDN</u> did not explain whether the <u>Feist</u> question of
23 whether selection and arrangement of facts that are not themselves
   eligible for copyright was or was not a question of law.  Instead,
24 <u>CDN</u> merely cited <u>Harper House</u> for the proposition that the question
   of whether prices were facts was reviewed de novo.  197 F.3d at
25 1259 n.1.  As explained above, this determination differs from the
   question of whether selection of uncopyrightable facts is
26 sufficiently creative.

1  of convention and strict industry standards." _Id._ at 722. All
2  individuals preparing a similar document "ultimately would have
3  selected the same facts to include." _Id._  In particular, because
4  external forces required that the plaintiff "list all facts which
5  affect marketable title, there was no room for creativity in
6  determining which liens or which encumbrances to include in the
7  title commitment." _Id._ at 723.

8      In _Matthew Bender_, the Second Circuit considered the selection
9  and arrangement of information in publication of federal court
10 opinions.  158 F.3d at 683.  Plaintiffs sought a declaratory
11 judgment that certain elements of West Publishing Company's
12 formatting of Court of Appeals and Supreme Court opinions were not
13 eligible for copyright protection.  The Second Circuit held that
14 the selection and arrangement of certain information was so limited
15 by external factors that no creativity was involved.  As to the
16 parties' names, the deciding court, and the dates of argument and
17 decision, the selection of these facts for inclusion was compelled
18 by these facts' importance, and selection was not a function of
19 West's creativity.  _Id._ at 683.  As to the arrangement of
20 information regarding subsequent appellate history before the same
21 court--amendments, rehearings, opinions related to rehearing en
22 banc--the court held that there would almost never be more than
23 "one or two realistic or useful options" as to how to arrange this
24 information, and that the choice among these options would be
25 dictated by the form of the later decision and its timing relative
26 to the printing of the reporter.  _Id._ at 685.  Similarly, "the

1  standard of the legal profession" determined the use of parallel

2  or alternative citations, leaving no room for the exercise of

3  creativity.  Id.

4      Even when multiple options for selection or arrangement are

5  available, the choice from among those options must be non-obvious

6  in order to be protectable.  In Feist, the Supreme Court held that

7  the selection of information published in a phone book--a person's

8  name, town, and telephone number--"could not be more obvious." 499

9  U.S. at 362.[11]  The alphabetical listing of names was equally

10 obvious and therefore uncopyrightable.  Id. at 363.  In a similar

11 case, the Eleventh Circuit concluded that the arrangement of

12 listings in a yellow pages directory under categories such as

13 "attorneys" and "banks," or the division of "churches by

14 denomination or attorneys by area of specialty," was obvious for

15 purposes of Feist.  BellSouth Adver. & Publ'g Corp. v. Donnelley

16 Info. Publ'g, 999 F.2d 1436, 1444 (11th Cir. 1993).

17     The above factors may preclude a finding of creativity even

18 when they reduce the range of options to very few, but not a

19 single, choice for selection or arrangement.  Matthew Bender, 158

20 F.3d at 687-88.  In such a scenario, affording copyright protection

21 to the choice may make it impossible for future authors to avoid

22 infringement.  Id.  When options are so constrained, the choice of

23 any one option is not creative.  Id.

24 _____

25     [11] Although common practice is to include addresses in phone
   directories, it is not as clear to this court as it was to the
26 Supreme Court in Feist that addresses form a necessary component
   of a phone book.  Nonetheless, this court is bound by Feist.

1       In contrast, when the choices for selection or arrangement are
2   not  so  constrained,  the  choice  among  them  may  demonstrate
3   protectable creativity or "exercise of judgment."  <u>Key Publ'ns,</u>
4   <u>Inc. v. Chinatown Today Pub. Enters, Inc.</u>, 945 F.2d 509, 513 (2d
5   Cir. 1991).  <u>Key Publications</u> concerned a business directory for
6   New York's Chinese-American community.  <u>Id.</u> at 511.  The Second
7   Circuit held that both the selection and arrangement of information
8   demonstrated creativity.  The selection was creative because, at
9   the minimum, the directory's author excluded "businesses she did
10  not  think  would  remain  open  for  very  long,  such  as  certain
11  insurance  brokers,  take-out  restaurants,  and  traditional  Chinese
12  medical  practitioners,"  and  identification  of  these  business
13  required  creative  judgment.  <u>Id.</u> at 513.  The arrangement of
14  listings  within  the  directory  was  creative  because  it  involved
15  creation  of  categories  "of  particular  interest  to  the
16  Chinese-American community and not common to yellow pages, e.g.,
17  'BEAN CURD & BEAN SPROUT SHOPS.'"[12]  <u>Id.</u> at 514.

18      In another opinion concluding that the selection of facts for
19  inclusion  in  a  compilation  was  creative,  the  Second  Circuit
20  considered selection of baseball pitching statistics.  <u>Kregos v.</u>

21

22      [12] However, under Ninth Circuit precedent, the decision to
    create a Chinese-American business directory is an idea that is not
23  copyrightable.  <u>Rice</u>, 330 F.3d at 1175.  If, once this decision is
    made, external factors dictate the inclusion of a category for
24  "bean curd and bean sprout shops," adoption of this category is not
    creative.  The Second Circuit in <u>Key Publications</u> did not address,
25  and this court does not profess to know, whether this particular
    category is so obvious to New York's Chinese-American community as
26  to demonstrate an absence of creativity.

1  <u>Associated Press</u>, 937 F.2d 700 (2d Cir. 1991).  The compilation

2  used nine statistics for each player.  <u>Id.</u> at 702.  This particular

3  combination  had  not  been  previously  used,  and  one  of  these

4  statistics had not be used in any prior compilation.  <u>Id.</u> at 703.

5  The defendant had moved for summary judgment on the ground that

6  this selection was not copyrightable.  <u>Id.</u>  The Second Circuit

7  upheld the district court's denial of defendant's motion.  Where

8  "there are at least scores of available statistics about pitching

9  performance available . . . and therefore thousands of combinations

10  of data that a selector can choose . . . . It cannot be said as a

11  matter of law that in selecting the nine items . . . [plaintiff]

12  has failed to display enough selectivity to satisfy the requirement

13  of originality."  <u>Id.</u> at 704.

14              **b.    Substantial Similarity of Protected Elements in The**

15                      **Elkdom Travel Guides**

16       In this case, Carmichael Elks argue that the 1988 editions of

17  Elkdom Travel Guides I and II demonstrate the requisite creativity

18  in selection and arrangement of the information to be included, as

19  well as in the notes accompanying some entries, and that Leonard

20  has infringed upon these elements.[13]   The court considers these

21  _____

22       [13] Carmichael Elks also argue that the maps included in the
    original guides are eligible for copyright protection.  Leonard
23  does  not  dispute  this,  and  instead  argues  that  there  is  no
    similarity between the protectable elements of the Carmichael Elks
24  maps and the maps used in Leonard's guides.  Carmichael Elks
    implicitly concede this point--they argue that Leonard's maps
25  contain public domain information and information that is not
    eligible to copyright, but Carmichael Elks identify no similarities
26  between Leonard's maps and theirs.

1 choices separately.

2            **i.   Selection of Categories of Information**

3     Carmichael Elks argue that the selection of categories of

4 information included is entitled to protection.  Before addressing

5 this argument, the court notes that the decision to publish a

6 travel guide for Elks is an idea that is not itself copyrightable,

7 as it is akin to the idea to create a show that explains magic

8 tricks, or a guide to the prices of coins.  <u>Rice</u>, 330 F.3d at 1175,

9 <u>CDN</u>, 197 F.3d at 1262.

10     Carmichael Elks therefore may not use copyright law to prevent

11 others from publishing such a similar guide--now that Carmichael

12 Elks have come up with the idea, copyright law encourages others

13 to build upon it.  <u>Feist</u>, 499 U.S. at 350.  Thus, the Carmichael

14 Elks cannot protect the selection of information that would be

15 necessary or obvious in any travel guide for Elks.  <u>See, e.g.,</u>

16 <u>Matthew Bender</u>, 158 F.3d at 683, 685.  For this reason, the guides'

17 inclusion of the following information for each lodge is not

18 protectable: city name, lodge number, phone number and address.

19 Inclusion of meeting times, dining room hours, and bar hours was

20 also obvious in light of the guide's purpose.  The submitted

21 evidence indicates that the needs of the guides' intended readers

22 compelled the inclusion of meeting times, dining room hours, and

23 bar hours, and Carmichael Elks, who bears the burden of proof on

24 this issue at trial, has not submitted any evidence supporting a

25 contrary conclusion.  <u>Matthew Bender</u>, 158 F.3d at 685.  Selection

26 of this information is therefore obvious (if not necessary) and

1  non-creative.

2      Carmichael Elks also argue that the decision to include

3  information for RV travelers is entitled to copyright protection.

4  Plainly, not all Elks travel by RV.  Accordingly, the decision to

5  include such information in the general guide was not compelled by

6  external circumstances.  The decision to include this information,

7  as opposed to any other information regarding any of the other

8  amenities that appeal to only subsets of Elks travelers, may

9  "display [the] minimal level of creativity" required by the Supreme

10 Court in <u>Feist</u>.  499 U.S. at 358-59.  However, this decision--to

11 include RV information in a guide for general Elks travelers--was

12 not copied by Leonard.  Instead, Leonard has published a series of

13 guides specifically for Elks RV travelers.  Leonard's "Elk RV

14 Travel Guides" do not include entries for Elks lodges without RV

15 facilities, instead listing these lodges only in an abbreviated

16 appendix.  Thus, although Carmichael Elks may have displayed a

17 modicum of creativity in determining that a general audience of

18 Elks would appreciate RV information, Leonard did not appropriate

19 this creative judgment, because he instead published guides

20 specific to RV travel.  Accordingly, there is not a material

21 question regarding the substantial similarity with respect to this

22 selection of RV information in general.

23     Although there is no similarity regarding this general

24 decision, Leonard did copy the selection of particular categories

25 of RV information for inclusion--RV parking availability, fees,

26 hookups for electricity, water and dumping, and existence of an RV

1    club.  Carmichael Elks argue that the selection of these specific

2    categories is subject to copyright protection.  Although the

3    creativity or judgment involved in selection of these categories

4    is hardly overwhelming, Carmichael Elks have demonstrated that

5    other travel guides including RV information do not all include

6    these categories of information, and that other guides often

7    include other categories not found in the Elkdom Travel guides.

8    Accordingly, while selection of these categories may not be

9    entitled to significant protection, they exceed the low threshold

10   adopted by Feist and illustrated by the above-cited cases.

11   Moreover, all of the Elk RV Travel Guides include these exact

12   categories of RV travel information, such that a jury could find

13   that substantial similarity exists with regard to this protectable

14   element.  Accordingly, Leonard's motion for summary judgment as to

15   Carmichael Elks' claim must be denied on this ground.

16                    **ii.  Arrangement of Information**

17        The decisions to group the entries by state, to arrange states

18   alphabetically, and to arrange cities within each state

19   alphabetically are all obvious and under the cases ineligible for

20   copyright protection.[14]  The arrangement of information within each

21   entry (in the 1988 Guides, within each "tile") is, under the cases,

22   equally uncreative.  Some aspects of this intra-entry arrangement,

23   _____

24        [14] Carmichael Elks argue that the decision to arrange the
     lodges alphabetically by city, rather than in order of lodge
25   number, demonstrates creativity.  Even if the court were to accept
     that contention that the numerical organization was viable, the
26   range of available options is too small for the selection of an
     alphabetical arrangement to be protectable.

such as the arrangement of information regarding electricity, water, and dumping RV hookups, are arbitrary, and do not reflect the exercise of creative judgment. <u>Key Publ'ns</u>, 945 F.2d at 513. To the extent that the arrangement does reflect judgment, the arrangement is obvious, such as the choice to list the name of the city first, or to list whether there is RV parking before listing whether there are hookups for RVs. Accordingly, neither the arrangement of entries within the guides nor the arrangement of information within each entry is copyrightable. The court wishes to be clear that this conclusion has no bearing on its separate conclusion that selection of this information for inclusion is potentially subject to copyright.

The court does not address whether the graphical layout of the guides--in "landscape" format or in a square of tiles--represents a copyrightable arrangement, because Leonard did not copy these elements.

### iii. Notes

Carmichael Elks have also demonstrated a question of material fact as to whether Leonard's Elk RV Travel Guides I and II have infringed upon the notes included in Elkdom Travel Guides I and II. Carmichael Elks identify notes for seven Colorado cities for which Elk RV Travel Guide II includes a note that is either similar to, or a verbatim copy of, the note included in the Elkdom Travel Guide II. These notes identify the nearest major cross streets, provide added information about the location of the lodge, and/or identify alternative RV parking and available RV facilities. Pl.'s Mem.

33

1  Opp. Mot. Summ. J., 21:18 - 22:4.  Carmichael Elks contend that
2  these examples drawn from Colorado listings are representative of
3  the similarities in all states included in Guides I and II.
4  Leonard does not challenge the representativeness of these
5  examples, instead arguing that the these notes are not protectable.

6      At least some of these notes reflect creative judgment. Notes
7  of this type are provided only for some lodges.  The decision as
8  to when to include a note of this type involved the "minimal level
9  of creativity" required by Feist, such that these notes are
10 protectable. 499 U.S. at 358-59. For example, although this court
11 must conclude that inclusion of certain information about the
12 lodges themselves is obvious, the identification of information
13 about alternative RV facilities is not.

14     Nor can the court conclude that the selection of facts
15 included in Leonard's Elk RV Travel Guides I and II is as a matter
16 of law dissimilar under the extrinsic test.  Because of Leonard's
17 access to the guides, only a low degree of proof of similarity is
18 needed.  Swirsky, 376 F.3d at 844.  Thus, a trier of fact may
19 conclude that Leonard's selection is similar because it includes
20 many of the same notes, despite the fact that Leonard also added
21 and omitted some notes.

22     **3.   Summary of Carmichael Elks' Claim**

23     For the reasons stated above, the court grants Leonard's
24 motion for summary judgment as to Carmichael Elks claim for
25 infringement insofar as the claim is based on infringement of the
26 originally registered editions of Elkdom Travel Guides I and II.

Carmichael Elks's selection of which types of RV information to include was a creative judgment that is eligible for copyright protection.  Material questions of fact exist as to whether all of Leonard's Elks RV Travel Guides are substantially similar to the Carmichael Elks' Elkdom Travel Guides I and II in this regard under the extrinsic test, such that both extrinsic and intrinsic similarity must be decided by the trier of fact.  Separately, the court concludes that at least some notes included in Elkdom Travel Guides I and II are eligible for protection, and that triable questions exist as to whether Leonard's Elks RV Travel Guides I and II are substantially similar in this regard.

**B.    Leonard's Counterclaim**

Leonard also moves for summary judgment on his counterclaim for infringement of the copyrights he registered in 2007.  Leonard argues that Carmichael Elks copied notes and maps he created; Leonard does not claim any protected interest in the selection of general categories of information or in the arrangement of his guides.   Despite  the  narrowness  of  this  counterclaim,  the counterclaim raises similar issues of the registrations' validity, protectability of Leonard's work, and infringement.  Carmichael Elks  also  argue  that  Leonard  worked  under  a  work-for-hire arrangement, such that ownership of any copyrightable work created by Leonard initially vested in the Lodge, and not Leonard.  The court does not address these issues, because Carmichael Elks have demonstrated a triable question as to whether Leonard is equitably estopped from bringing this claim.  Therefore, Leonard's motion for

1  summary judgment as to this claim must be denied.

2  Equitable estoppel is available as a defense to copyright

3  infringement actions.  Hampton v. Paramount Pictures Corp., 279

4  F.2d 100 (9th Cir. 1960), Pamfiloff v. Giant Records, Inc., 794

5  F. Supp. 933, 937 (N.D. Cal. 1992), 4-13 Melville B. Nimmer & David

6  Nimmer, Nimmer on Copyright § 13.07 (2008).  This form of estoppel

7  is a defense in which plaintiff's past conduct bars the plaintiff

8  from asserting certain rights.  Although a party may be equitably

9  estopped from bringing a suit for copyright infringement, either

10 for past or future uses of the protected work, estoppel cannot

11 effect a transfer of "ownership of the copyright which originally

12 vested in the works' authors." Pamfiloff, 794 F. Supp. at 937.

13 In a copyright infringement action, four elements are

14 necessary to establish estoppel: "(1) The party to be estopped must

15 know the facts; (2) he must intend that his conduct shall be acted

16 on or must so act that the party asserting the estoppel has a right

17 to believe it is so intended; (3) the latter must be ignorant of

18 the true facts; and (4) he must rely on the former's conduct to his

19 injury." Hampton, 279 F.2d 100, 104 (9th Cir. 1960); accord United

20 States v. King Features Entertainment Inc., 843 F.2d 394, 399 (9th

21 Cir. 1988).  This test, so formulated, does not differ from the

22 more general approach to estoppel in this circuit. Tellingly, King

23 Features cited Bob's Big Boy Family Rests. v. N.L.R.B., 625 F.2d

24 850, 854 (9th Cir. 1980), a non-copyright case, as authority for

25 the elements of estoppel in a copyright infringement action.  King

26 Features, 843 F.2d at 399.

1    In this case, Leonard argues that the Carmichael Elks' use of

2  Leonard's works prior to March 31, 2007 was permissive, and that

3  Leonard's conduct during this time could not estopp Leonard from

4  revoking such permission and then enforcing his copyright through

5  an infringement action arising out of the Elk's use of Leonard's

6  material after March 31, 2007.   Leonard bases this argument on

7  Professor Nimmer's phrasing of the elements of estoppel in an

8  infringement action, and in particular, Nimmer's phrasing of the

9  first element.   Citing <u>Hampton</u>, 279 F.2d 100, Nimmer states that

10 the first element is that "the plaintiff must know the facts of *the*

11 *defendant's infringing conduct*."   4-13 Nimmer on Copyright § 13.07

12 (emphasis added).   Leonard argues that because there was no

13 infringing conduct prior to Leonard's revocation of permission,

14 Leonard's conduct prior to this time cannot satisfy the first

15 element of the estoppel test.[15]

16    Contrary to Leonard's argument, courts that have considered

17 the issue have held that a copyright owner's conduct during a

18 period of permissive use may estopp the owner from later revoking

19 permission and bringing an infringement claim.   <u>Carson v. Dynegy,</u>

20 <u>Inc.</u>, 344 F.3d 446, 453 (5th Cir. 2003), <u>DeCarlo v. Archie Comic</u>

21 <u>Publ'ns</u>, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001), <u>Quinn v.</u>

22 _____

23    [15] More fully, Leonard argues that "anything Leonard did prior
24 to January 19, 2007 [the date on which Leonard sent a letter
   revoking permission to use his works] is irrelevant because there
   was no infringement prior to that date.   Without such infringement,
25 subsequent acquiescence to the infringement, the infringer's
   ignorance of the infringement claim, and reliance on the copyright
26 owner's acquiescence, there can be no estoppel."   Def.'s Reply, 14.

1 City of Detroit, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998).

2 Leonard's reading of Nimmer is belied by the fact that Nimmer cites

3 these cases for this proposition.  For example, Nimmer explains

4 Carson as a case where an "employee who previously consented to his

5 company's exploitation of the subject work . . . . [was] estopped

6 to complain post-termination about the company's continued usage

7 of his work."  4-13 Nimmer on Copyright § 13.07.  Alternatively,

8 to the extent that Nimmer's statement that the owner must have had

9 knowledge of "the infringing conduct" does compel Leonard's

10 conclusion that infringement must predate the conduct giving rise

11 to estoppel, Nimmer is at variance with the Ninth Circuit test for

12 estoppel in infringement actions.  King Features, 843 F.2d at 399,

13 Hampton, 279 F.2d at 104.  Neither King Features nor Hampton used

14 Nimmer's language, nor did either case discuss such a requirement.

15 Instead, King Features demonstrated that the normal test for

16 estoppel applies by citing Bob's Big Boy Family Restaurants, which

17 considered an estoppel argument raised in the context of a labor

18 dispute.  King Features, 843 F.2d at 399.

19     Having rejected the rule proposed by Leonard, the court turns

20 to the application of the ordinary estoppel factors.  Because the

21 Ninth Circuit has not considered analogous facts, the court bases

22 this analysis on Carson, DeCarlo and Quinn, each of which applied

23 an estoppel framework consistent with the Ninth Circuit's decisions

24 in King Features and Hampton.

25     In Carson, the plaintiff had created a copyrightable

26 spreadsheet while employed by defendant.  344 F.3d at 448.  This

38

spreadsheet was authored and owned by plaintiff.  Plaintiff had encouraged other defendant's employees to use the spreadsheet.  Id. at 499.  Plaintiff was later fired for unrelated reasons.  Id. at 450.  When the defendant continued to use the spreadsheet, plaintiff brought a claim for copyright infringement.  Id.  When defendant moved for summary judgment on the ground that plaintiff was estopped from bringing this claim, plaintiff argued that defendant could not satisfy the first, third, and fourth elements of the test for estoppel.  Id. at 453 (quoting the Nimmer formulation of the elements of estoppel).

The Fifth Circuit affirmed the grant of summary judgment, concluding that all of the elements of estoppel were satisfied. The first element was satisfied by plaintiff's knowledge of defendant's use of the spreadsheet.  Id. at 455. The Fifth Circuit specifically rejected the argument that the plaintiff must have had knowledge of infringing use of the spreadsheet, instead holding that knowledge of non-infringing use during the period of employment was sufficient.  Id. at 455 n.9 (citing Basic Books, Inc. v. Kinko's Graphics Corp., 758 F. Supp. 1522, 1540 (S.D.N.Y. 1991)).  Although the court stated that the second element was not in dispute, the court's analysis implied that defendant's reliance on plaintiff's conduct was reasonable in part because of the "clear relationship" between the parties.  Id. at 455 n.9 (distinguishing Steinberg v. Columbia Pictures Indus., Inc., 663 F. Supp. 706, 715-16 (S.D.N.Y. 1987)).  The third element was satisfied because defendant was ignorant of the fact that plaintiff, rather than

1 defendant, owned the spreadsheet.  Id. at 453-54.  "[Plaintiff]
2 encouraged the adaptation, modification, and preparation of a
3 derivative program for other [Defendant's] employees to use.
4 [Plaintiff], . . . admitted that he never explicitly told anyone
5 that the worksheet could not be modified or used unless he was
6 present and he never appeared to correct the impression among some
7 of [Defendant's] employees that [the spreadsheet] was a
8 team-created program."  Id. at 453.  Although the Fifth Circuit
9 discussed plaintiff's encouragement of the creation of derivative
10 works as part of the third element, this fact also speaks to the
11 second and fourth elements.  Id.  Finally, the court held that the
12 fourth element could be satisfied by defendant's reliance on
13 plaintiff's conduct during the course of plaintiff's employment,
14 even though the alleged infringement only occurred after the
15 employment ended. Id. at 455.

16     The opinion in Carson drew heavily from an Eastern District
17 of Michigan opinion, Quinn v. City of Detroit, 23 F. Supp. 2d 741
18 (E.D. Mich. 1998).  Quinn also concerned a plaintiff who had
19 prepared a program while employed by defendant, who consented to
20 the employer's use of the program while the plaintiff was employed,
21 and who later revoked this consent upon his termination and claimed
22 that the defendant's continuing use of the program was infringing.
23 Id. at 743-44.  After a bench trial, the court concluded that
24 plaintiff was estopped from bringing this claim.  The four estoppel
25 factors were satisfied because plaintiff had known of the
26 defendant's use of the program, plaintiff had consented to such

1   use, and the defendant had detrimentally relied upon this consent

2   by abandoning the prior program.  Id. at 753, see also Carson, 344

3   F.3d at 454 (discussing Quinn).  The court did not separately

4   address the defendant's ignorance of the facts.  As explained in

5   Carson, Quinn therefore held that a plaintiff's conduct prior to

6   the alleged infringement may estopp a plaintiff from bringing an

7   infringement claim.

8       The Southern District of New York reached a similar result

9   in DeCarlo v. Archie Comic Publ'ns, Inc., 127 F. Supp. 2d 497

10  (S.D.N.Y. 2001).  Plaintiff DeCarlo was a comic book artist who had

11  drawn strips published by defendant.  Id. at 499.  Plaintiff

12  claimed that he owned the rights to a comic book character, and

13  that defendant had been granted only a limited license.  Id. at

14  501.  However, defendant had for years used the character in ways

15  exceeding the license plaintiff claimed to have granted, plaintiff

16  knew of this use, and plaintiff had not objected.  Id.  Plaintiff

17  then brought an infringement claim when defendant attempted to use

18  the character in a motion picture.  Id. at 502.  The court granted

19  summary judgment to  defendant on the ground of equitable estoppel.

20  First, "[plaintiff] indisputably knew that [defendant] conducted

21  itself as if it owned the rights that [plaintiff] now claims belong

22  to him."  Id. at 509.  Second, because of plaintiff's relationship

23  with defendant, plaintiff's silence and inaction in the face of

24  defendant's repeated use justified reliance on plaintiff's conduct.

25  Id. at 510.  "[I]t is immaterial to a claim of estoppel that there

26  was no actual attempt to defraud or mislead."  Id. (quoting CBS,

41

1   *Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369 (2d Cir. 1975)).

2   Third, defendant believed that it possessed the disputed rights to

3   the character, and was ignorant of the fact that plaintiff claimed

4   such rights. *Id.* at 511.  Fourth, defendant relied on plaintiff's

5   conduct by entering a movie production deal and agreeing to

6   indemnify the other party from copyright infringement claims prior

7   to plaintiff's assertion of ownership.  Because defendant had

8   repeatedly asserted ownership over the work, and plaintiff failed

9   "ever to voice a complaint or make a competing claim in the face

10  of numerous opportunities to do so," defendant had "the right to

11  rely on [plaintiff's] silence."  *Id.* at 511.

12      In this case, the evidence permits a trier of fact[16] to

13  conclude that the first three estoppel elements, as interpreted by

14  these cases, are satisfied.  The first is satisfied because Leonard

15  both knew of Carmichael Elks' use of the guides, *Carson*, 344 F.3d

16  at 451; *Quinn*, 23 F. Supp. 2d at 753, and of Carmichael Elks'

17  belief that they owned the copyright to them, *DeCarlo*, 127 F. Supp.

18  2d at 509.  The second element is satisfied by Leonard's affixation

19  ───────────────

20      [16] For purposes of this motion, the court need not resolve
    whether the trier of fact for these questions will be the jury or
21  the court.  However, to inform the parties' future briefing, the
    court notes that because estoppel is an equitable defense, "except
22  for any issues which may be common to . . . legal claims, [an]
    equitable estoppel defense presents issues to be resolved by the
23  court." *Granite States Ins. Co. v. Smart Modular Techs.*, 76 F.3d
    1023, 1026-28 (9th Cir. 1996).  When legal claims tried to a jury
24  raise factual questions that overlap with the estoppel questions,
    "the legal claims involved in the action must be determined prior
25  to any final court determination of the equitable claims." *Id.* at
    1027 (internal quotations and modification omitted).  In this
26  order, the court does not decide whether such common issues exist.

a copyright notice stating that the Carmichael Elks owned the work, Leonard's implicit consent to the Elks' use of the work, Leonard's longstanding relationship with the Carmichael Elks, and his knowledge of the Elks' belief regarding copyright.  Carson, 344 F.3d at 455 n.9, DeCarlo, 127 F. Supp. 2d at 510.  Third, for years, Carmichael Elks were ignorant of Leonard's claim to ownership in the guides.  Carson, 344 at 453-54, DeCarlo, 127 F. Supp. 2d at 511.

As to the fourth element, the evidence would enable a trier of fact to conclude that during this period of ignorance, Carmichael Elks reasonably relied upon Leonard's consent to use the copyrighted notes, as Carmichael Elks passed information received from Elks lodges and members on to Leonard to incorporate, rather than incorporating this information themselves.  A trier of fact could conclude that this reliance was detrimental insofar as it prevented the Carmichael Elks from incorporating these notes into a work actually owned by the Lodge.  This form of detriment is analogous to the abandonment of a prior software system in Quinn, 23 F. Supp. 2d at 755.  Carmichael Elks has a similar, although weaker, claim to detrimental reliance on Leonard's maps.  Because Leonard incorporated these maps into the Elkdom Travel Guides, Carmichael Elks will suffer expense if they are required to remove these maps from the hundreds of pages in the current publications.  Such expense will accrue even if the Carmichael Elks merely replace Leonard's maps with the former handwritten ones.  Because Leonard had repeatedly caused these notes and maps to be published under

1   the Carmichael Elks' copyright notice, the court cannot conclude

2   as a matter of law that Carmichael Elks did not reasonably and

3   detrimentally rely on Leonard's conduct.

4       Therefore, a trier of fact could conclude that Leonard's

5   conduct prior to his 2007 assertion of ownership of the copyright

6   in the 2006 editions of the Elkdom Travel Guides estopps Leonard

7   from bringing an infringement action against the Carmichael Elks

8   regarding their use of these guides.  Estoppel applies not only to

9   the Carmichael Elks' prior use of these guides, but also

10   prospectively.  Accordingly, Leonard's motion for summary judgment

11   as to this claim must be denied.

12                   **IV.  CONCLUSION**

13       For the reasons stated above, defendant and counter-claimant

14   Leonard's motion for summary judgment, Doc. No. 38, is DENIED, both

15   as to plaintiff's claim and as to defendant's counterclaim.

16   Pursuant to Fed. R. Civ. P. 56(d)(1), the court GRANTS partial

17   summary adjudication to defendant Leonard as to plaintiff's

18   infringement claim, concluding that this claim may proceed solely

19   insofar as it alleges infringement based on copying of the

20   selection of particular categories of RV information and of notes

21   included in the registered versions of Elkdom Travel Guides I and

22   II.

23       IT IS SO ORDERED.

24       DATED:  September 15, 2009.

25

26                           LAWRENCE K. KARLTON
                               SENIOR JUDGE
                               UNITED STATES DISTRICT COURT